Micheal F. Ram, SBN 104805
mram@forthepeople.com
Colin Losey, SBN 352223
colin.losey@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6293

Will Ourand (pro hac vice)
**MORGAN & MORGAN**
158 N Harbor City Blvd,
Melbourne, FL 32935
Telephone: (321) 241-0255
Facsimile: (321) 361-3554

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| NAPA VALLEY G EXPERIENCE LLC and JUAN MORALES,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MOTORS, LLC,<br><br>Defendant. | CASE NO. 3:26-cv-03148-WHO<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## Table of Contents


I. Introduction ..... 1

II. Parties, Jurisdiction, and Venue ..... 4

A. The Plaintiffs ..... 4

B. The Defendant ..... 6

C. Jurisdiction and Venue. ..... 6

III. Factual Allegations ..... 7

A. Automatic transmissions become more complex as gears are added, creating more potential failure points and requiring a robust design and manufacturing process. ..... 7

B. GM and Ford co-develop the 10-speed transmission. ..... 10

C. The Transmission Defect. ..... 15

D. GM introduces the 10-speed in 2017-18 model year vehicles in limited fashion before expanding it to more applications, touting the transmission as high-performing and efficient. 23

E. GM knew the 10-speed was defective based on its own testing and analysis, and based on the real-world problems, service bulletins, and litigation plaguing the Ford 10-speed. ..... 26

F. GM issues a series of service bulletins directed to the 10-speed. ..... 30

G. GM misrepresents the scope of the defect while issuing its first rear-wheel lockup recall 35

H. GM issues another recall 10-speed wheel lockup recall ..... 38

I. GM and its dealers purchase an aftermarket fix ..... 40

J. GM's "Gen 3" valve body does not fix the problem. ..... 42

K. GM is still producing, marketing, and selling vehicles with defective 10-speed transmissions. ..... 44

IV. The Limitation Periods are Tolled. ..... 58

V. Class Action Allegations ..... 60

VI. Counts ..... 62

VII. Request for Relief ..... 77

Plaintiffs bring this action on behalf of themselves and others that purchased or leased General Motors (GM) vehicles equipped with defective 10-speed transmissions.

## I. Introduction

1. Automobile transmissions are essential to vehicle safety, reliability, emissions, and performance. They connect the engine to the wheels and convert raw power into the proper balance of force and speed so the vehicle can accelerate and decelerate safely and predictably. Given this critical role, defective transmissions can undermine the driver's ability to control the vehicle. This causes problems such as violent or erratic shifting, delayed acceleration when merging into highway traffic, and even a complete loss of motive power that can suddenly stall and strand the vehicle in the roadway.

2. Automatic transmissions convert engine power through gear ratios (also referred to as speed ratios) and clutches. They use hydraulic and electronic control to regulate pressure and shift timing. This delivers manageable torque to the drive wheels.

3. Traditionally, automatic transmissions had just a few gears. More recently, automakers have raced to add more. They have gone from 4- and 5-speeds to 8-, 9-, and now 10-speeds. Automakers claim this improves fuel economy and performance by keeping the engine in its most efficient range.

4. While adding gears can improve efficiency and performance, it comes with major challenges. More gears mean more shifting, which causes more wear and stress on parts. It also puts greater demands on the computer and control systems that manage every gear change, and it requires tighter coordination between mechanical, hydraulic, and electronic components, as well as between all the various other components of the driveline (i.e. the engine, safety systems, etc.). Accordingly, if the transmission (which includes all the hardware components, the electronic controller, and the software residing within) is not properly and robustly designed and built, the added complexity can lead to defects and safety concerns rather than enhanced performance.

5. GM introduced its 10-speed transmission on a limited basis in model year 2017–18 vehicles, touting it as a "breakthrough" in performance and efficiency. Those promises and representations were neither true nor accurate. In reality, GM failed to design and manufacture its 10-speed transmission platform to withstand the demands of real-world performance, as defined by user expectations.

6. The GM 10-speed transmission's lack of robustness causes premature degradation of the system, which in turn results in hesitation between gear changes, jerking, slipping, and harsh shifts. This escalates, in some cases, to dangerous wheel lock-ups that can bring vehicles to a violent stop on the interstate, which endangers drivers and passengers. As a result, consumer complaints have mounted, and automotive journalists and technicians and other industry commentators have criticized these defects. This has prompted GM to issue technical service bulletins and related recalls. But GM's actions have been too little, too late to remedy the fundamentally defective nature of the 10-speed transmission and the severe consequences it has had for GM's customers, who have been left saddled with expensive vehicles they cannot trust to provide safe and reliable transportation.

7. GM knew or should have known, from preproduction testing, that its 10-speed transmission was defective. Shifting issues, harsh engagement, and drivability problems would have surfaced during that process and should have been corrected before the transmission ever reached consumers.

8. GM also should have known about the 10-speed's shortcomings because GM jointly developed the transmission with Ford, which broadly deployed its 10-speed transmission in its popular F-150 trucks in 2017. GM had a front-row seat to that rollout, which was met with consumer complaints, industry criticism, and even class action litigation over the transmission's harsh shifting and drivability issues. Despite this, GM pressed forward.

9. Rather than publicly acknowledging and addressing potential concerns, GM instead set up internal restriction and exchange programs through a series of service bulletins, to its dealers, that placed the 10-speed transmission and its torque converter on part restriction.

Dealers were required to contact GM's Product Quality Center before performing repairs. This meant transmission replacements were routed through GM itself. These measures confirm that GM knew of potential concerns with the transmission, yet it chose to manage them quietly rather than to admit the truth to consumers.

10. GM more recently issued several recalls in response to numerous incidents, wherein the rear wheels on GM vehicles, equipped with 10-speed transmissions, locked up without any forewarning or operational notification to the driver. This led to several reported crashes, resulting in physical injuries and property damage, as well as many additional near misses.

11. Despite the mounting evidence, the obvious dangers, and the apparent inability to provide an actual fix, GM continues to sell and to lease vehicles, equipped with its defective 10-speed transmission, to unsuspecting consumers.

12. Plaintiffs all purchased or leased GM vehicles equipped with the defective 10-speed transmission. Because GM has proven unable to fix the defect, Plaintiffs are left with the Hobson's choice of repeatedly attempting to have their vehicles serviced by GM dealers with nothing more than temporary band-aids, turning to aftermarket suppliers for costly fixes that void their warranties, selling their vehicles at a significant loss, or incurring early lease termination fees. In every scenario, Plaintiffs have been deprived of the safe, reliable, and defect-free transportation they paid premium prices for and were promised.

13. The same defect affects many GM customers who purchased and leased GM vehicles throughout California. All are in the same position as Plaintiffs.

14. Whether GM's 10-speed transmission suffers from a common defect, what GM knew and when, and whether GM failed to disclose and/or to remedy the defect are questions that can and should be resolved on a class-wide basis.

15. Litigating the technical questions surrounding the design, manufacture, and safety of GM's 10-speed transmission on a one-by-one basis would result in needless duplication of discovery, expert testimony, and court resources. By contrast, resolving these issues once, in a

single proceeding, ensures consistent outcomes, conserves judicial resources, and avoids the risk of conflicting rulings on the same defect.

16. A single, class-wide resolution of the common issues is therefore not only appropriate but necessary to adjudicate the claims, arising from GM's defective 10-speed transmission, fairly and efficiently. Plaintiffs' allegations are based on personal knowledge as to their own experiences and, as to all other matters, on the investigation of counsel. That investigation includes review of GM marketing materials, warranty terms, technical service bulletins, recall materials, NHTSA complaints and recall filings, dealer repair information, and other publicly available information that concerns the 10-speed transmission and its manifestations. Plaintiffs reserve the right to amend this Complaint as additional evidentiary support is obtained through further investigation and discovery.

## II. <u>Parties, Jurisdiction, and Venue</u>

### A. The Plaintiffs

17. Napa Valley G Experience, LLC ("Napa Valley G Experience") is a California limited liability company with its principal office in Napa, California. Napa Valley G Experience purchased a pre-owned 2022 Suburban (VIN 1GNSKFKD1NR142454) in or around March 2023. Prior to purchasing the Suburban, the owners of Napa Valley G Experience who made the purchasing decision for the vehicle visited GM's website and saw GM advertisements regarding Suburban model vehicles.

18. Over time, Plaintiff Napa Valley G Experience's Class Vehicle began to exhibit clunking, rattling, and similar harsh mechanical noises that are common manifestations of the Transmission Defect as identified below.

19. Juan Morales is a citizen of California that purchased a pre-owned 2021 Sierra 1500 Crew Cab Denali Diesel (VIN 3GTP8FET4MG282688) from Moss Bros. Chevrolet, a GM-authorized dealer, in Moreno Valley, California on May 20, 2023. Mr. Morales spoke with dealership personnel about the vehicle prior to purchasing the Sierra. He likewise viewed GM's

website and saw GM advertisements regarding Sierra model vehicles prior to purchasing the Sierra.

20. Plaintiff Morales's Class Vehicle exhibits harsh and erratic shifting, during both acceleration and deceleration, and other symptoms of the Transmission Defect described in detail below.

21. Plaintiff Morales has taken his Class Vehicle to authorized GM dealership Simpson Buick GMC of Buena Park, California, to address the transmission defect symptoms. Those service visits include August 5, 2025-September 17, 2025 (mileage 82,920), November 24, 2025-January 7, 2026 (mileage 85,829), January 9, 2026 (mileage 85,900), February 4, 2026-Febuary 18, 2026 (mileage 87,423), and February 20, 2026-March 11, 2026 (mileage 87,532). The dealer replaced the transmission during the February 20, 2026-March 11, 2026 service visit.

22. Morales would consider purchasing or leasing GM vehicles again if GM truthfully disclosed the existence, scope, and repair status of the Transmission Defect and whether an effective repair exists. Absent injunctive relief, Morales cannot rely on GM's advertising, labeling, warranty, or service statements concerning the safety, reliability, durability, and repair status of GM vehicles equipped with the 10-speed transmission.

23. Plaintiffs bring California claims because each named Plaintiff purchased a Class Vehicle in California and each claims injury that arose from GM's California-directed marketing, sale, warranty, repair, and nondisclosure conduct. To the extent necessary, Plaintiffs seek certification of a California class limited to persons and entities that purchased and/or leased Class Vehicles within California, regardless of their state of residence. Plaintiffs' experiences are representative of the Transmission Defect and its class-wide manifestations. Morales experienced harsh and erratic shifting and presented his vehicle to an authorized GM dealer for repair on multiple occasions, culminating in transmission replacement. Napa Valley G Experience experienced clunking, rattling, and other harsh mechanical noises consistent with the Transmission Defect.

**B. The Defendant**

24. General Motors, LLC (GM) is a Delaware limited liability company which maintains its principal place of business at 300 Renaissance Center, Detroit, Michigan, 48265.

25. GM designs, manufactures, markets, warranties, and distributes automobiles throughout the U.S. and the world under a variety of different brand names, including Chevrolet, GMC, and Cadillac.

**C. Jurisdiction and Venue.**

26. This Court has personal jurisdiction over GM because GM has purposefully availed itself of the privilege of conducting substantial business in California, including advertising, marketing, distributing, selling, servicing, repairing, and warranting vehicles throughout California and within this District. This action arises out of and relates to those contacts because Plaintiffs purchased or leased Class Vehicles in California, sought warranty or repair services for the Transmission Defect in California, and GM's California-directed conduct forms part of the claims alleged herein.

27. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act or "CAFA") because: (i) the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the classes; (ii) members of the classes (as defined below) are citizens of states different from GM; and (iii) greater than two-thirds of the members reside in states other than the states in which GM is a citizen.

28. This Court also has subject matter jurisdiction of this case because Plaintiffs have brought claims under a federal statute—the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.

29. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, including GM's marketing and sale of Class Vehicles in California and the purchase, lease, service, repair, and manifestation of the Transmission Defect in California. Venue is also proper because GM

conducts substantial business in this District and throughout California in connection with the Class Vehicles.

## III. Factual Allegations

### A. Automatic transmissions become more complex as gears are added, creating more potential failure points and requiring a robust design and manufacturing process.

30. Automatic transmissions were first introduced in 1940 by Cadillac and Oldsmobile under the "Hydra-Matic" brand name. The 10-speed transmissions at issue in this case also bear the Hydra-Matic branding.

31. The first GM Hydra-Matic was a four-speed transmission.

32. Nissan and BMW introduced the first five-speed automatic transmissions into their vehicle lineups starting in 1989 and 1990, respectively. GM followed suit in 2001. Subsequently, GM and Ford worked together to develop a 6-speed transmission, which was rolled out in 2008-09 model year vehicles. GM then went on to develop its own 8-speed transmission. GM did this before working with Ford, again, to develop the 10-speed transmission platform at issue in this case.

33. Transmissions serve a critical role in the vehicle's powertrain and have a significant impact on safety, economy, and overall vehicle performance and control.

34. The transmission acts as the drivetrain's control center. It links the engine to the wheels by adjusting torque and speed through its gears and sending power through the output shaft to the rest of the drivetrain.

35. The engine produces rotational power and torque within a limited revolutions per minute ("RPM") range. Both values vary depending on engine speed. At lower speeds, sending direct engine power to the wheels would stall the engine; at higher speeds, the engine would over-rev. The transmission solves this problem by multiplying torque in low gears while reducing wheel speed and by reducing torque multiplication in higher gears to allow greater wheel speed.

36. Transmissions traditionally have fixed gear ratios. In automobiles, the gear ratio is how many times the engine turns as a ratio of the number of output shaft turns. For example,

a 3:1 ratio means the engine turns three times for everyone one turn of the output shaft. This is like using a low gear on a bike—those extra engine turns give the gears more turning force, which is converted into greater torque at the output shaft. That produces more force (aka tractive effort) at the wheels but lower wheel speed.

37. In other words, lower gears have higher ratios. This produces more torque but lower wheel speed. Higher gears have lower ratios, including overdrive. This produces less torque but higher wheel speed. This is why, for example, low gears on a bicycle are useful for climbing hills and high gears are better for riding on flat roads.

38. A transmission's range of gear ratios has a direct impact on vehicle performance and efficiency. The more gear ratios available, the more precisely the transmission can match engine torque and speed to varying driving conditions. More precise matching means stronger acceleration, when needed, and lower engine RPM, which means more efficient cruising.

39. But, there are tradeoffs in adding more gear ratios. Increasing the number of gear ratios leads to greater complexity. This, in turn, can introduce more possible failure points into the system.

40. In an automatic transmission, each gear change is handled by a transmission control unit (TCU), working with sensors and actuators. The TCU monitors factors like vehicle speed, engine RPM, throttle position, and load. When the TCU decides it is the optimal time to shift, it commands hydraulic valves and solenoids to route pressurized automatic transmission fluid (ATF) to specific clutches and brakes affixed to the planetary gear sets. ATF is a special oil that not only lubricates and cools the transmission but also transmits power through the torque converter and operates the hydraulic systems that make automatic shifting possible. More gears mean more shifting events and more components that must operate in perfect synchronization. This increases both the precision required for optimal control and the potential for wear or malfunction.

41. The torque converter connects the engine to the transmission and allows the vehicle to stop without stalling. It also influences how each gear change feels in a modern

multi-speed automatic. Because it sits between the engine's crankshaft and the transmission's input shaft, all engine power flows through it.

42. Inside the converter, the impeller is driven by the engine which accelerates transmission fluid outward; that fluid drives the turbine–connected to the transmission. This happens while the stator redirects returning flow to multiply torque at low speeds. This hydrodynamic coupling permits some slip. The turbine turns slightly slower than the impeller. So, a portion of engine output is dissipated as heat. This happens more during acceleration and gear changes.

43. To reduce inefficiency and to sharpen shift feel, modern torque converters use a lockup clutch that mechanically ties the turbine to the converter cover, when conditions allow. When properly designed and controlled, the lockup clutch minimizes slip, reduces heat, and delivers direct, efficient power transfer. If poorly calibrated, degraded, or designed, the torque converter lockup clutch can induce excessive slip or shudder, accelerating wear of the converter, transmission fluid, and internal components.

44. The torque converter is involved in every gear change because it sits in the power path from the engine to the transmission. Each shift creates fluctuations in hydraulic pressure, torque load, and rotational speed inside the converter (and across the lockup clutch when used). More shifts mean more thermal and mechanical cycles. This increases cumulative wear and the risk of premature degradation.

45. The hardware and software controlling automatic transmissions has also increased in complexity as more gears are added. Engineers model shift logic as a two-dimensional map with throttle/load on one axis and vehicle speed on the other. In the simplest case, a 4-speed uses a 4×4 grid: 4 speed breakpoints and 4 throttle breakpoints define preferred gear zones, and the boundaries between those zones set the upshift and downshift points. A 6-speed likewise requires at least a 6×6 grid, and a 10-speed requires at least a 10×10 grid, so each added gear has its own stable operating zone and the controller can maintain hysteresis between adjacent zones.

46. Complexity scales quickly: a 4×4 map has 16 cells and, for a 4-speed, up to 12 directed shift calibrations (N·(N–1)); a 6×6 map has 36 cells and up to 30 calibrations; a 10×10 map has 100 cells and up to 90 calibrations. Those base maps are then multiplied by overlays for torque-converter lockup, drive modes (Normal, Sport, Tow), grade and temperature protections, and adaptive learning. This expands the calibration to thousands of control points.

47. These maps run on the TCU, which is a hardened, embedded microcontroller with finite processing power and finite memory capacity (RAM/flash). It is constrained by packaging, heat, vibration, and cost. As gear count and overlays increase, the TCU must sample more sensors, evaluate more cells, and compute more timing/pressure commands per second, while driving multiple solenoids in closed loop. If processing power or memory are limited—often a cost-driven constraint—the controller must use coarser maps and simplified logic. When the TCU cannot keep pace, it may select the wrong cell or mistime the pressure ramps, causing gear hunting, delayed or harsh shifts, shudder, and similar transmission performance problems.

48. In short: transmissions have grown far more complex over the past several decades, with the GM Hydra-Matic line expanding from 4-speeds up through the 10-speed transmissions at issue in this case. Given the greater complexity and more potential failure points in the 10-speed transmission, it was imperative that GM design and produce a robust transmission platform capable of reliably performing under real world conditions. Unfortunately, GM failed this task.

**B. GM and Ford co-develop the 10-speed transmission.**

49. In 2013, GM and Ford announced their plans to develop, jointly, 9-speed and 10-speed transmissions.[1] GM's Vice President of Global Transmission Engineering, Jim Lanzon,

[1] Brooke, Lindsay, *Rivals in the Showroom, Ford and G.M. Will Develop Transmissions Jointly*, THE NEW YORK TIMES, available at https://archive.nytimes.com/wheels.blogs.nytimes.com/2013/04/15/rivals-in-the-showroom-ford-and-g-m-will-make-transmissions-jointly/ (April 15, 2013).

explained that these new transmissions would "drive fuel economy improvements into both company's future product portfolios."[2]

50. The 9-speed and 10-speed transmissions were based on the companies' previous 6-speed transmissions, which were also developed as a joint project, as previously noted.

51. Both companies deployed their 10-speed transmissions in a variety of vehicle models.

52. Ford designated its 10-speed transmissions as its "10R" series, comprising the "10R 60," "10R 80," "10R 80 MHT," and "10R 140."

53. Ford's 10-speed was the first to hit the market in mass fashion. Ford broadly equipped the 10R 80 transmission in its flagship F-150 vehicles beginning in the 2017 model year.

54. GM, in turn, designated its 10-speed transmissions as its "10L" series, including the "10L60," "10L80," "10L90," and "10L1000 (Allison)" transmissions. GM equipped those transmissions in the following vehicles:

| Transmission | Models |
|---|---|
| 10L60 | 2020-2024 Chevrolet Camaro V6 |
| 10L80 | 2019-present Chevrolet Suburban<br>2018-present Cadillac Escalade<br>2018-present Chevrolet Tahoe<br>2018-present GMC Yukon Denali<br>2019-2024 Chevrolet Camaro<br>2019-present Chevrolet Silverado/GMC Sierra 1500 |
| 10L90 | 2017-2024 Chevrolet Camaro ZL1 |

[2] Id.

| | |
|---|---|
| | 2019-2020 Cadillac CT6<br>2020-present Cadillac CT5<br>2020-present Cadillac CT4 |
| 10L1000 (Allison) | 2020-present Chevrolet Silverado HD/GMC Sierra HD |

55. The 2019-present Sierra and 2019-present Suburban vehicles, identified immediately above, comprise the "Class Vehicles" at issue in this case. References in this Complaint to GM vehicles other than the Class Vehicles are included as common-defect, notice, knowledge, causation, and remedy allegations only. Plaintiffs do not seek to include those other vehicle lines in the proposed California Class unless and until the class definition is amended.

56. Plaintiffs' Class Vehicles are equipped with GM's 10-speed automatic transmission. Class membership can be determined through objective records without individualized merits inquiries.

57. GM has deployed its 10L transmissions in sedans, trucks, and sport utility vehicles (SUVs). It has likewise deployed them in both gasoline and diesel vehicles.

58. GM designated its "10L1000" as an "Allison" transmission. Allison is well-known for making particularly durable transmissions for heavy use applications. But GM, not Allison, was responsible for the final design of the 10L1000. Allison simply licensed its branding to GM and potentially consulted on the transmission engineering to some unknown degree.

59. GM's 10L-series family ("family" defined as all variants based on the same core architecture) of automatic transmissions share a common design lineage and core operating architecture. This includes a ten-speed arrangement generated through four simple planetary gearsets and six friction clutches, and the same or substantially similar: electronically controlled hydraulic actuation; adaptive clutch-pressure and shift-timing strategies; transmission control unit modules and powertrain control unit modules; diagnostic logic and DTC selection processes;

and torque-converter, valve-body/mechatronic, and control-system architecture, design principles, and operational characteristics.

60. The commonality amongst the transmissions within the 10L family are evidenced by GM's service bulletins, replacement parts, and recalls, as well as by aftermarket component parts which can be used throughout the family.

61. For instance, GM has issued safety recalls covering multiple 10L variants for the same or substantially similar defect mechanism, including National Highway Traffic Safety Administration ("NHTSA") Recall No. 24V-797 (covering 2020-2022 Chevrolet Silverado 1500, 2500, 3500, GMC Sierra 1500, 2500, 3500, 2021 Cadillac Escalade, Escalade ESV, Chevrolet Tahoe, Suburban, GMC Yukon, and Yukon XL models) and NHTSA Recall No. 25V-148 (covering 2019-2020 Cadillac CT6, 2020-2021 CT4, CT5, and 2020-2022 Chevrolet Camaro models). As will be detailed further below, each recall identifies a momentary drive-wheel lock-up condition arising from a fault in the transmission's internal operation, and each recall attributes that condition to the same underlying failure mode—namely, wear within the valve body that adversely affects hydraulic control of the transmission's clutches. Notably, GM elected to address the condition in both recalls through the same category of remedy: a transmission control module software update designed to detect and mitigate the conditions under which the valve body wear produces the drive-wheel lock-up event, rather than address the root cause hardware and replace the worn component itself. That GM identified the same failure mode across distinct 10L variants, and prescribed the same form of software-based remedy for each, is itself powerful evidence that the affected transmissions share a common architecture, common control logic, and a common defect.

62. Aftermarket transmission supplier Sonnax Transmission Company—a leading independent engineering firm specializing in transmission component design and remanufacture—has likewise identified the GM 10L60, 10L80, 10L90, and 10L1000 transmissions as all subject to the same underlying condition animating NHTSA Recall Nos. 24V-797 and 25V-148: a loss of hydraulic control pressure caused by progressive wear and ATF

leakage through the feed limit low valve and its surrounding bore within the transmission's valve body. As Sonnax explains in its published technical analysis *Understanding '19-Later GM 10-Speed Safety Recall*, ATF leakage caused by wear at the feed limit low valve disrupts the precise circuit pressures that govern clutch application, causing unintended hydraulic engagement of a clutch and producing the momentary drive-wheel lock-up event that prompted GM's recalls. Sonnax's independent engineering conclusion thus corroborates what GM's own pattern of recalls already reveals: the drive-wheel lock-up condition is not the product of any variant-specific anomaly or a fault of the axle design or axle hardware, but is the predictable consequence of a shared, family-wide hydraulic-control defect common to every 10L transmission at issue in this case.[3]

63. The common architecture is further confirmed by the fact that a single aftermarket replacement component addresses the recall condition across all 10L series transmissions. Specifically, Sonnax engineers, manufactures, and sells one drop-in Feed Limit Low Valve Kit (P/N 105740-54K) and one companion Feed Limit High Valve Kit (P/N 105740-58K), each cataloged for use in the GM 10L60, 10L80, 10L90, and 10L1000 transmissions alike. In other words, the same physical component, of the same dimensions, addresses the same hydraulic failure mode across the entire 10L transmission family. That is strong engineering evidence that these transmissions share a common valve body architecture and hydraulic-control design—and, consequently, a common defect.[4]

64. Indeed, valve body replacements are so common throughout the GM 10L transmission family that the company issued service bulletin 25-NA-336, titled "Information on 10L60, 10L80, 10L90, 10L1000 After Installing a Service Valve Body or Reinstalling a Valve Body After a Repair, DTC P0777 Immediately Sets."

---

[3] Sonnax Tech. Res. No. 1519, *Understanding '19-Later GM 10-Speed Safety Recall* (May 16, 2025), https://www.sonnax.com/tech_resources/1519-understanding-the-19-later-gm-10-speed-safety-recall.
[4] Sonnax Part No. 6011, *Feed Limit High Valve Kit – 105740-58K*, https://www.sonnax.com/parts/6011-feed-limit-high-valve-kit

65. In short, although individual 10L variants are adapted for vehicle-specific applications—including torque capacity, calibration, and case/package dimensions—they derive from a common underlying architecture and share substantially similar core design features across the 10L family.

66. The defect at issue arises from the common architecture, substantially similar command-and-control schema, and core design features identified above, rather than variant-specific calibrations or packaging.

67. The GM 10-speed was not robustly designed and manufactured, resulting in consumers being saddled with expensive vehicles equipped with unreliable transmissions that deliver inconsistent shift events. These defective transmissions have reportedly resulted in real world crashes, injuries, and property damage.

**C. The Transmission Defect.**

68. A modern automatic transmission contains and is controlled by an integrated command-and-control system in which software issues continuous commands (e.g., timing, gear selection, clutch engagement) and hardware executes those commands by routing pressurized ATF through precisely engineered passageways to actuate clutches (friction devices to smooth engagement of two rotating shafts, bringing them to the same speed) and brakes (a similar friction device designed to stop the rotation of a shaft relative to the housing, thus bringing it to zero speed). Transmission performance at any moment is the product of the software commands and the hardware execution, and transmission reliability over time is the product of the integration of the two, all of which depends upon sufficiently robust adaptive control schema to deal with the rigors of age and expected wear.

69. The reliable performance of such a system depends on its robustness: the TCM's ability to command the hardware to cause a change in the operational state of the transmission and verify that the transmission is operating appropriately as a result of the command. Sufficient robustness is needed to meet the expectations of an ordinary operator across the range of ordinary

driving conditions and to ensure no abnormal or unexpected operation. Robustness in this sense has three interdependent functional components:

a. Software architecture/firmware: the foundational, compiled software that determines when and how the transmission shifts, how it modulates hydraulic pressure, how it sequences clutch engagement, and how it communicates operational information to the controllers of the rest of the powertrain. In a robust design the transmission monitors its own operational state and compensates when that state deviates from what the firmware commands;

b. Hardware and the manufacturing processes that produce it: the valve body, clutch packs, friction materials, torque converter, solenoids, seals, gears, hydraulic passageways, and the transmission fluid that lubricates and hydraulically actuates them, which are engineered and manufactured to contain and direct that fluid through its commanded passageways under the pressures and at the cadence the firmware commands;

c. Calibration: the tunable parameters on top of the firmware that adjust shift points, shift feel, shift harshness, and related responses to operator input and, in a robust design, account for driver operation and component wear over time, all as permitted by the underlying software architecture.

70. The GM 10L series transmissions lack robustness across all three functional components defined above. Its firmware (the architecture of the code that governs the behavior of the transmission) lacks the shift strategy necessary to reliably control a ten-speed transmission across ordinary operating conditions, and lacks the monitoring and compensation logic necessary to detect and respond to hardware degradation as it develops. Its hardware and manufacturing processes lack the robustness necessary to contain transmission fluid within its commanded passageways under the loads ordinary operation imposes. Transmission fluid leaks from those passageways into unintended regions of the transmission, the leaking fluid wears the surfaces

along the leak paths, the wear expands the leak paths, and the rate of further leakage accelerates—a degrading loop of events that over time culminates in unintended operation of the transmission, which is not identified and corrected by the system as it should be pursuant to proper robust system design methodology. Its calibration cannot deliver the customization and refinement for particular applications and driver styles that calibration is intended to deliver, because the firmware and hardware deficiencies do not provide sufficient domain to account for and adapt to common and expected anomalous system behavior. The consumer complaints, bulletins, and recalls detailed below are manifestations of GM's failure to design, manufacture, and integrate a robust transmission capable of performing reliably and durably across the typical and expected operating conditions of the vehicles in which the 10L is installed.

71. The condition described in ¶ 70 is referred to in this Complaint as the "Transmission Defect." The Transmission Defect is common to the Class Vehicles: although it manifests along three dimensions—firmware, hardware/manufacturing, and calibration—it arises from GM's common design, engineering, manufacturing, and integration decisions across all three, not from any vehicle-specific variation, supplier choice, or aftermarket condition, and it is present in every Class Vehicle.

72. The Transmission Defect manifests through a related family of symptoms that drivers and passengers experience as unintended operation of the transmission: harsh and clunking shifts, shift hunting and indecision, hesitation and delayed engagement, torque-converter shudder, loss of motive power, and, in the most severe manifestations, unintended rear- or front-wheel lockup. These symptoms are described in detail below. They are outward expressions of the same root condition: a transmission whose firmware commands hydraulic and mechanical transitions that the hardware cannot completely and consistently execute as intended, installed in a hardware platform that progressively loses its ability to execute those commands as the leakage-and-wear cycle described above advances. The valve body—the hydraulic control unit that translates the firmware's pressure and timing commands into the physical actuation of

clutches and gears—is the primary locus of this leakage-and-wear cycle, and the component whose premature degradation drives the cascading failures described below. The inability of the hardware, firmware, and calibration to capture, acknowledge, and adapt to the adverse effects of wear and age presents itself as a lack of robustness which is responsible for the issues reported by drivers which are detailed in this Complaint.

73. The integration of the firmware and hardware components of the 10L magnifies the Transmission Defect along two reinforcing feedback loops. First, within the hardware itself, the leakage of transmission fluid into unintended regions causes wear in the leak paths, which enlarges those paths and increases the rate of further leakage—a self-accelerating degradation of the hardware's ability to execute the firmware's commands, independent of any further command activity. Second, across the firmware-hardware interface, the harsh shift schedules and imprecise pressure modulation the firmware commands impose mechanical and hydraulic loads on the already-degrading hardware that exceed what ordinarily would be expected from the operation of a 10-speed transmission, accelerating the leakage-and-wear cycle beyond what the hardware's intrinsic deficiencies would produce on their own. Robust transmission firmware should do two things in response to this kind of hardware degradation: monitor for the effects of the unintended fluid migration that causes the degradation, and adjust its commands to compensate for the resulting degraded operational state. The firmware in the Class Vehicles does neither. Instead, the firmware continues to command pressure and timing transitions as if the hardware were performing in a non-degraded manner, while the hardware grows progressively less capable of executing those commands. The command stream issued by the firmware and the operational output produced by the hardware therefore drift progressively out of synchronization over the life of the transmission—a condition referred to in this Complaint as the "commanded-versus-actual divergence" which is at the heart of the Transmission Defect.

74. The Transmission Defect is common across the 10L family. The 10L family shares a fundamental common firmware and hardware architecture (i.e., the valve body

geometry, the hydraulic circuit topology, the clutch assemblies, and the torque-converter-clutch interface). As alleged above, the variant-specific differences among the 10L60, 10L80, 10L90, and 10L1000—torque capacity, clutch sizing, calibration set, and package dimensions—operate at the calibration and component-sizing layers, which sit above the firmware-hardware interface from which the commanded-versus-actual divergence stems. Those variant-specific differences therefore do not eliminate the Transmission Defect.

*(i) The Transmission Defect's operational manifestations.*

75. The Transmission Defect produces three categories of symptomatic manifestations experienced by drivers and passengers. Each category flows from the same root mechanism—the commanded-versus-actual divergence—and each is described in turn below:

a. Harsh mechanical noises and sensations during shift events: clunks, bangs, shudders, jerks, and similar impacts, particularly at low speeds and during torque-converter-clutch apply and release;

b. Unreliable and inconsistent acceleration and deceleration: hesitation, delayed engagement, hunting between gear ratios, erratic gear selection inconsistent with driver input, and even complete loss of motive power; and

c. Wheel lockup: Events culminating in drive (rear- or front-) wheel lockup while the vehicle is in motion, presenting a serious safety risk.

76. Harsh mechanical noises and sensations: The firmware commands ATF flow to generate pressure at the clutches and/or the brakes, producing shift transitions at a cadence and at tolerances the valve body and hydraulic circuit cannot deliver smoothly. The hardware deficiently executes those commands: clutches engage with more force than the commanded ramp specifies, hydraulic pressure transitions overshoot or undershoot the commanded profile, and the torque-converter-clutch applies and releases at edges sharper than the commanded

modulation. The commanded-versus-actual divergence during these shift events transmits through the driveline as the clunks, bangs, shudders, and jerks that the drivers experience.

77. Unreliable and inconsistent acceleration and deceleration: The firmware shift-matrix logic—encompassing on the order of potentially 100 distinct shift events across the transmission's ten forward gears—calls for shift events whose frequency and complexity exceed the system's hardware and computer capacity to execute as commanded. When the commanded shift exceeds what the hardware can execute within the anticipated shift event duration, the transmission cannot complete the commanded gear change on the expected schedule. The resulting indeterminacy in gear selection and engagement timing produces hesitation, delayed engagement, hunting between gears, erratic gear selection inconsistent with driver input, and even complete loss of motive power.

78. Wheel lockup: The drive wheels of the Class Vehicles are mechanically coupled to the transmission's output shaft; when the output shaft ceases to rotate, the drive wheels cease to rotate with it. That is precisely what occurs in one of the most severe expressions of the Transmission Defect: the transmission momentarily engages two gears at once, the conflicting engagements arrest the output shaft, and the drive axle locks with it—producing tire slip, skidding, and loss of directional control of the vehicle at speed. The unintended dual-gear engagement is itself a product of the leakage-and-wear cycle described above: as the valve body's sealing surfaces and clearances degrade in ordinary in-service operation, ATF escapes its commanded circuits and flows into clutch/brake-apply passages the TCU has not commanded and cannot detect, in turn hydraulically engaging a clutch or brake the TCU believes to be disengaged. Because the TCU operates on the assumption that fluid is present only where its firmware has directed it, the TCU is structurally blind to this failure mode—it cannot diagnose or arrest the lock-up event, and the operator receives no warning before the drive wheels lock up. This wheel-lockup-at-speed condition is one of the most dangerous manifestations of the

Transmission Defect, and the manifestation that ultimately drove the October 2024 and March 2025 recalls detailed below.

*(ii) Safety consequences and materiality.*

79. The safety consequences of the Transmission Defect are uniform across the 10L family, are acute, and are of the kind any reasonable consumer would consider material to the decision whether to purchase or lease a vehicle equipped with a 10L transmission. The defect's operational manifestations (i.e., harsh mechanical impacts during shift events, unreliable acceleration and deceleration, loss of motive power, and wheel lockup) and its durability manifestation of accelerated hardware wear each produce distinct safety consequences and impair the Class Vehicles' central function.

80. *Driver startle, distraction, and impaired vehicle control from harsh shift events.* The clunks, bangs, shudders, and jerks the Transmission Defect produces during shift events are not merely matters of ride quality. A vehicle that delivers an unexpected mechanical impact through the driveline at low speed, during torque-converter-clutch apply, or during stop-and-go traffic startles the driver, momentarily diverts attention from the roadway, and can cause involuntary steering or pedal input. The risk is most acute in precisely the operating environments in which 10L-equipped vehicles are most frequently driven: urban traffic, parking maneuvers, and low-speed transitions in which pedestrians, cyclists, and other vehicles are in close proximity. These harshness manifestations are not isolated events; they recur across the operating envelope because the commanded-versus-actual divergence that produces them is continuously regenerated by the firmware each time the transmission is commanded to shift.

81. *Compromised ability to execute time-critical maneuvers.* The Transmission Defect produces hesitation, delayed engagement, hunting between gears, and erratic gear selection inconsistent with driver input, each of which directly compromises the driver's ability to execute the maneuvers on which collision avoidance depends. Highway merging, lane changes at speed, passing on two-lane roads, and evasive acceleration to avoid a developing hazard all

require that the transmission deliver the torque exactly as the driver commands, at the moment the driver commands it. A transmission that hesitates, hunts, or selects a gear inconsistent with driver input cannot reliably deliver that torque. The driver who depresses the accelerator expecting a downshift and instead receives a delay of one or two seconds—or a shift to the wrong gear—is denied the vehicle response on which the maneuver depends and is exposed to collision risk that a non-defective transmission would not have created. (The expected response time of a typical shift is on the order of a third of second.)

82. *Loss of motive power and wheel lockup.* The most severe operational manifestations of the Transmission Defect are the sudden loss of motive power and the locking of the vehicle's driven wheels while the vehicle is in motion. GM has admitted as much. The October 2024 and March 2025 recalls were predicated on GM's own determination that 10L-equipped vehicles can experience sudden wheel lockup at road speeds, that those events can occur without warning, and that they create an unreasonable risk of crash. GM apparently failed to determine an actual fix for the condition; instead, GM's remedy for that risk is not to repair the defect but to deploy software that monitors for the wear that precedes such events and, when wear thresholds are crossed, locks the transmission into fifth gear, impairing the vehicle's functionality to avoid the crash risk the defect would otherwise present. A defect whose only available remedy is to disable most of the vehicle's gears in order to prevent crashes is, by GM's own engineering judgment, a safety defect.

83. *Impact to the entire drivetrain.* The Transmission Defect's manifestations have negative consequences throughout the drivetrain (the driveshaft, wheels, axles, bearings, etc.). Excessive shift shock, rough engagements, and vibrations as a function of shudder throughout the drivetrain will cause, among other things, an increased wear rate of the driveshaft, tires, axles, bearings, and other components comprising the vehicle's drivetrain, leading to a possibility of premature failure of those components which will cause maintenance costs to substantially increase over the life of the vehicle.

84. *Materiality.* For the foregoing reasons, a reasonable consumer purchasing or leasing a 10L-equipped vehicle would consider the Transmission Defect material to the transaction because it poses a safety hazard and affects the Class Vehicles' central function of providing reliable transportation. A reasonable consumer would not knowingly purchase or lease, or would not pay the price GM charged for, a vehicle whose transmission (i) cannot reliably perform its intended function across ordinary driving conditions over the expected life of the vehicle; (ii) produces a recurring risk of harsh shift events that distract the driver during low-speed maneuvering; (iii) compromises the driver's ability to execute time-critical collision-avoidance maneuvers; (iv) can without warning lose motive power or lock its driven wheels while in motion; (v) wears at accelerated rates; and (vi) is subject to a defect whose remedy is to disable most of the transmission gears once wear thresholds are crossed.

**D. GM introduces the 10-speed in 2017-18 model year vehicles in limited fashion before expanding it to more applications, touting the transmission as high-performing and efficient.**

85. GM introduced the 10-speed transmission in a limited-production Camaro ZL1 "high performance" model. In doing so, the company touted that the "10-speed . . . helps maintain optimum rpm levels for maximum responsiveness and quicker lap times," with the obvious goal of getting consumers to associate the 10-speed transmission with high-performance, high value, and improved efficiency.[5]

86. In 2018, GM broadened limited availability of the 10-speed automatic transmission to select higher-displacement models of the Chevrolet Suburban, Cadillac Escalade, Chevrolet Tahoe, and GMC Yukon Denali, while repeatedly promoting the transmission's "high efficiency" and "high performance." These representations were material to reasonable

---

[5] 2017 Chevrolet Camaro Brochure, p. 9, available at https://cdn.dealereprocess.org/cdn/brochures/chevrolet/ca/2017-camaro.pdf

consumers and intended to induce purchases and leases. But GM knew that these representations were false and misleading for the reasons detailed throughout this Complaint.

87. For instance, in its marketing materials for the 2018 Cadillac Escalade, GM touted that the "6.2L 420 hp V8 is paired with a new, intelligent 10-speed automatic transmission that moves between gears in the smoothest, most efficient fashion."[6]

88. Similarly, GM's marketing materials for the 2018 Tahoe tells consumers that the 6.2L Performance Package includes "a new 10-speed Hydra-Matic® automatic transmission [which] is designed to maximize engine power for responsiveness under acceleration."[7]

89. GM then expanded the 10-speed into its popular Chevrolet Silverado 1500 and GMC Sierra 1500 truck lines in the 2019 model year. Again, GM continued to tout the 10-speed as highly efficient and high performing in its promotional materials for these vehicles.

90. The 2019 Silverado 1500 brochure, for instance, included a section titled "STRENGTH IN NUMBERS: SILVERADO PROVIDES THE PERFECT POWERTRAIN."[8] That section goes on to promise "SMOOTH-SHIFTING TRANSMISSIONS," explaining: "Included with the available Duramax 3.0L Turbo-Diesel and 6.2L EcoTec3 V8, a highly efficient 10-speed automatic transmission provides impressive refinement and performance, including enhanced acceleration and torque delivery while towing."[9]

91. Likewise, the 2019 Sierra 1500 brochure promised that it was "engineered to deliver a balance of performance and efficiency in all driving situations," explaining: "The all-new 10-speed automatic transmission paired with the available 6.2L V8 and 3.0L Duramax Turbo Diesel . . . not only provides a wider range of gearing to help improve efficiency, but also

---

[6] 2018 Cadillac Escalade Brochure, p. 22, available at https://www.cadillac.com/content/dam/cadillac/na/us/english/index/downloads/vehiclebrochures/brochures/2018/on_star/2018%20Cadillac%20Escalade%20Catalog_revMAY2018.pdf

[7] 2018 Chevrolet Tahoe Brochure, p. 3, available at https://cdn.dealereprocess.org/cdn/brochures/chevrolet/2018-tahoe.pdf

[8] 2019 Silverado 1500 Brochure, p. 17, available at https://cdn.dealereprocess.org/cdn/brochures/chevrolet/2019-silverado1500.pdf

[9] Id.

incorporates enhancements designed to improve shift quality and further reduce noise and vibration in the driveline."[10]

92. GM then expanded the 10-speed transmission line into its "Heavy Duty" Silverado and Sierra diesel pickup trucks in the 2020 model year. Those vehicles are equipped with the so-called "Allison" 10L1000 transmissions.

93. In marketing the "Allison" 10-speed transmission, GM represented that it "OPTIMIZES GEAR SHIFTS FOR MAXIMUM POWER, TORQUE AND EFFICIENCY," and that the "RIGHT GEAR FOR THE SITUATION KEEPS RPM IN IDEAL POWER BAND."[11]

94. GM made and continues to make similar affirmations for all of its Class Vehicles equipped with 10-speed transmissions through its television, radio, print, online, and other advertising efforts, as well as through the instruction and training it provides to its dealers, who in turn convey the same representations to customers. In reality, however, the 10-speed transmission is and always was defective—and GM knew this to be the case. GM had and has a duty to disclose the Transmission Defect because GM possessed superior and exclusive knowledge of material facts concerning the defect; actively concealed and/or only partially disclosed information concerning transmission safety, reliability, efficiency, durability, and performance; and made affirmative representations in its marketing, warranty, and sales materials that were materially misleading absent disclosure of the defect. GM also had and has a duty to disclose because the Transmission Defect implicates unreasonable safety risks—including loss of propulsion, harsh downshifts, and momentary wheel lockup—as well as a compromised ability of the powertrain to meet applicable emissions standards.

---

[10] 2019 Chevrolet Sierra 1500 Brochure, p. 30, available at https://cdn.dealereprocess.org/cdn/brochures/gmc/ca/2019-sierra1500.pdf.

[11] 2020 GMC Sierra HD Brochure, p. 10, available at https://www.gmc.com/content/dam/gmc/na/us/english/index/about/download-brochures/2020-models/updated-2020-pdfs/2020-gmc-sierra-hd-catalog.pdf

95. The foregoing allegations regarding GM's marketing of the Class Vehicles are intended to establish both (i) that GM owed a duty to disclose the Transmission Defect to consumers, and (ii) that GM had available to it numerous mediums through which it could have made such disclosure. Those mediums include the advertisements through which GM conveyed the representations described above; GM's dealership network, which GM instructs and trains as to how the Class Vehicles are to be described and presented to consumers; GM's website and other digital properties; GM's television, radio, print, and online advertisements; GM's owner's manuals, brochures, and point-of-sale materials; and the various other channels of information through which GM marketed, advertised, promoted, and sold the Class Vehicles.

**E. GM knew the 10-speed was defective based on its own testing and analysis, and based on the real-world problems, service bulletins, and litigation plaguing the Ford 10-speed.**

96. Before releasing a new transmission, major automakers such as GM conduct a battery of preproduction tests designed to identify design flaws and durability issues, including but not limited to:

a. Dynamometer testing (mounting the transmission on a test stand and running it under varying torque and load profiles, including full-throttle launches, highway cruising, and simulated towing, to compress years of use into weeks of testing and reveal premature wear, pressure irregularities, and gear engagement problems);

b. Thermal and endurance testing (cycling the unit repeatedly through high-heat operating ranges and cold starts to expose failures in seals, clutch packs, and friction materials, as well as fluid breakdown and valve body sticking);

c. Shift quality and calibration testing (running the transmission through thousands of shift events under different throttle inputs, grades, and loads while monitoring pressure traces and clutch timing to identify harsh shifts,

flare, or gear-hunting caused by improper software calibration or hardware mismatch);

d. Vehicle-level road testing (installing transmissions into preproduction vehicles and driving them for the equivalent of years of actual service in varied real-world conditions—stop-and-go traffic, highway speeds, mountain grades, and heavy towing—to detect drivability concerns such as hesitation, shudder, slip, or lock-up under actual load conditions); and

e. Adaptability testing of the TCU to confirm that it properly accommodates (i) variation among drivers and changes in a single driver's habits over the ownership period; and (ii) changes in transmission response over time, including those caused by expected internal component wear and by degradation of the ATF across its service life.

97. The problems with GM's 10-speed transmission—hesitation, jerking, slipping, shudder, and wheel lock-up—are exactly the types of failures preproduction testing is meant to uncover. These problems therefore should have surfaced during reasonable preproduction testing, validation, and verification, and as such, GM knew or should have known that its 10-speed transmission was not sufficiently safe, reliable, or durable enough for consumer use before releasing it to the public.

98. In addition, GM had access to a significant real-world source of performance data for the 10-speed transmission: Ford's deployment of the 10-speed in its F-150 trucks beginning in 2017. This is significant because the Ford and GM 10-speed transmission platforms share a common design origin as they were initially co-developed. Although GM also released certain vehicles with 10-speed transmissions in 2017 and 2018, those deployments were limited to a narrower range of models, typically paired with higher-displacement engines. GM did not begin installing the 10-speed in its higher-volume models and trims until the 2019-20 model years.

99. Owing to their common design origin in the companies' joint venture, the Ford and GM 10-speeds share the same or substantially similar core physical architecture. Both

transmissions are built on the same ten-forward-gear layout, employ the same arrangement of four simple planetary gearsets, and use the same configuration of six clutches (four rotating and two stationary) to achieve their ten forward gear ratios. As explained in an article published by GEARS Magazine (the official trade publication of the Automatic Transmission Rebuilders Association), "[t]he whole 10-speed, 60, 80, 90, and 140 lines from both Ford and GM are a collaboration between the two automakers," and, as a result, the Ford and GM 10-speed transmissions "use many of the same parts" which "can be changed between the two units."[12] Examples of such commonly interchangeable parts identified in that article include "the P1, P2, and P3 [planetary gearsets], the CDF drum, and the front support."[13] Similarly, aftermarket suppliers offer parts which fit both transmissions, including TCC Priority Valve Kits,[14] solenoid stabilization retainers,[15] and even complete transmission rebuild kits.[16]

100. As Ford's joint-venture partner on the 10-speed program and as the manufacturer incorporating the same shared architecture into its own 10L transmission, GM should have monitored and been aware of the publicly available record of Ford's in-service experience with the 10R transmission.

101. Ford's deployment of the 10-speed in the F150 was met with near-instant negative feedback from consumers, industry analysts, mechanics, dealers, service facilities, journalists, and other sources.

102. Ford also issued multiple service bulletins to dealers regarding shift-related and transmission-related concerns in vehicles equipped with its 10-speed transmissions. These bulletins date back at least to March 2, 2018, when Ford issued TSB 18-2079 addressing harsh

---

[12] Brayton, *GM's 10L80 Pump Noise Gets Fixed Using a Competitor's Parts*, GEARS Magazine (June 4, 2024), https://gearsmagazine.com/magazine/gms-10l80-pump-noise-gets-fixed-using-a-competitors-parts/.
[13] Id.
[14] TCC Priority Valve Kit, Part No. 105740-03K, https://www.sonnax.com/parts/5641-tcc-priority-valve-kit.
[15] Solenoid Stabilization Retainer, Part No.: 105740-19K, https://www.sonnax.com/parts/5615-solenoid-stabilization-retainer.
[16] 10R80 & 10L80 Stage 1 DIY Kit/Transmission Rebuild Kits, https://applied-torque-solutions.com/products/ats-10r80-stage-1-build-kit?srsltid=AfmBOorerj8hpQfSf4_SlkhvR7VO6p2cF1nY46zm1pnNrrXX0hNk9BwK.

or delayed shift concerns in 10R80-equipped vehicles, and September 7, 2018, when Ford issued TSB 18-2274 addressing harsh or bumpy shift and engagement concerns. Ford later issued additional service bulletins concerning rattling sounds from the transmission bellhousing area, see TSB 19-2093, high-pitched whine noise, see TSB 20-2083, and harsh engagement, harsh shift, and delayed shift conditions, see TSBs 20-2403 and 21-2046.

103. The Ford 10-speed has also been the subject of class action lawsuits, the earliest of which, *O'Connor v. Ford*, was filed on July 26, 2019 in the U.S. District Court for the Northern District of Illinois. The *O'Connor* plaintiff alleged that 2017-2019 Ford F-150 vehicles with 10R80 transmissions are defective and "shift harshly and erratically, causing the vehicle to jerk, lunge, and hesitate between gears." *O'Connor v. Ford*, Case No.: 1:19-cv-05045, DE 1, ¶ 3. The plaintiff further quoted many complaints, dating back to April 2018, in which F-150 owners reported those same problems. *Id.* at ¶ 46.

104. Several additional class action lawsuits followed *O'Connor v. Ford*, each asserting the same or similar transmission failures and expanding the allegations to include additional model year vehicles. Those additional class actions include:

a. *Smith v. Ford*, Case No.: 5:20-cv-00211 (N.D. Cal.) (filed Jan. 10, 2020);

b. *Marino v. Ford*, Case No.: 1:20-cv-10048 (D. Mass.) (filed Jan. 10, 2020);

c. *Orndorff v. Ford*, Case No.: 2:20-cv-00247 (E.D. Pa.) (filed Jan. 14, 2020);

d. *McCabe v. Ford*, Case No.: 1:23-cv-10829 (D. Mass.) (filed June 2, 2023);

e. *Boggan v. Ford*, Case No.: 2:23-cv-00774 (N.D. Ala.) (filed Oct. 12, 2023); and

f. *Vangel v. Ford*, Case No.: 1:23-cv-22572 (S.D. Fla.) (filed July 11, 2023).

105. Ford's rollout of the 10-speed transmission provided GM with an opportunity to learn about, understand the cause and effect of, and develop strategies to fix or eliminate those issues in its 10-speed offering. Service bulletins, consumer complaints, and class action filings began accumulating almost immediately after Ford's release, signaling significant concerns with the jointly developed 10-speed architecture.

106. GM's own deployment of the 10-speed was likewise met with consumer complaints and transmission failures in the field. As detailed below, GM received wheel lockup complaints dating back to January 2020. A wheel lockup event caused by transmission failure is an extreme safety hazard and is something that should never occur with a properly designed and manufactured transmission. Even one reported incident would serve as cause for alarm. GM's own recall documentation confirms that GM recognized the issue and attempted to address it internally long before issuing the first recall. As detailed below, GM deployed software to detect excessive valve wear and to place vehicles into limp-home mode when such wear is detected, beginning with model year 2022 vehicles produced on or after January 11, 2022, and continuing with additional 10L-equipped vehicle lines in the months that followed. The determination of a potential root cause, the development of a software detection strategy, and the deployment of that strategy into new production vehicles is a lengthy, multi-stage process—confirming that GM's knowledge of the defect long predated deployment of the software strategy in January 2022.

107. In other words, GM's receipt of wheel lockup reports dating back to January 2020 and its development of a detection strategy for premature valve wear, combined with GM's other sources of knowledge (preproduction testing, service bulletins, Ford's deployment of the 10R), all confirm that GM has long known of the Transmission Defect.

108. Rather than pausing the use of the 10-speed amidst the many documented concerns as to its reliability and performance, GM instead continued to expand the 10L family across more vehicle models and trim levels.

**F. GM issues a series of service bulletins directed to the 10-speed.**

109. GM began issuing service bulletins pertaining to the 10L transmission series in early 2018. Those bulletins have continued through today.

110. GM's first bulletins directed to the 10-speed transmission were issued from 2016-2018. Those bulletins, PIP5477(A)-(E), informed dealers that "10L90 and 10L80 10 Speed Automatic Transmissions are on exchange through GM PQC [Product Quality Center] as part of

our ongoing quality improvement efforts to assist Engineering with product concern identification effective on 02/13/16."[17]

111. In other words, GM knew as early as 2016 of potential concerns with its 10-speed transmission and setup a transmission exchange program so that its dealers would be better prepared for the issues users would experience and potentially claim as a defective product. In and of itself, the action by GM to setup a transmission exchange program prior to production release of the 10-speed clearly demonstrates that GM expected a higher than normal failure rate.

112. On June 18, 2019, GM issued bulletin PIP5477K, advising dealers: "The 10L90 and 10L80 10 Speed Automatic Transmissions are on restriction through GM PQC as part of our ongoing quality improvement efforts to assist Engineering with product concern identification effective on 07/20/18."[18]

113. On June 19, 2019, GM issued bulletin PIP5573A, advising dealers: "The 10L80 and 10L90 10 Speed Transmission Torque Converter (Part numbers 24288828, and 24286575) are on restriction through the GM PQC as part of our ongoing quality improvement efforts to assist Engineering with product concern identification effective 06/25/2018."[19]

114. GM then issued a subsequent bulletin on October 2, 2019, providing a "correction" to prior bulletins, clarifying that the "10L60, 10L80, and 10L90" 10-speed transmissions were all on restriction (expanding the scope of the 10L transmissions under review by adding the 10L60).[20]

---

[17] GM Bulletin No.: PIP5477E, 10L90 10L80 10 Speed Automatic Exchange Program, available at https://static.nhtsa.gov/odi/tsbs/2018/MC-10137524-9999.pdf

[18] GM Bulletin No.: PIP54775, 10L90 10L80 10 Speed Automatic Transmission Restriction, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10162139-9999.pdf

[19] GM Bulletin No.: PIP5573A 2017 2019 10L80 10L90 Automatic Transmission Torque Converter Restriction, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10162144-9999.pdf

[20] GM Bulletin No.: PIP5677A, 2019 2020 10L60 10L80 10L990 Speed Gen II Automatic Restriction Program, available at https://static.nhtsa.gov/odi/tsbs/2019/MC-10167423-9999.pdf

115. Even as it was aware of significant concerns, GM rolled out the 10-speed and expanded its use across its vehicle lineup, touting the transmission's supposed high performance and efficiency.

116. On November 18, 2022, GM issued Bulletin 22-NA-232, which provided a "diagnostic tip" for the 10-speed "oil pump drive gear."[21] GM explained the problem, noting that customers may complain of a "whine, growl, or grind noise from the vehicle," which "may be present at idle and increase in intensity as engine RPM increases."[22] Additionally, GM noted that the condition is typically presented once the vehicle accumulates 15,000 or more miles.[23] GM explained that the "condition may be caused by the oil pump drive gears in the transmission," and instructed its dealers to remove and inspect gears within the oil pump for "abnormal wear, tooth damage, and side to side movement."[24]

117. GM revised bulletin 22-NA-232 on June 13, 2023, explaining "[i]mprovements to the oil pump drive and idler gears were made in the 2022 model year," and providing instructions for how to address whine/growl/grind noise complaints in 2022 and later model year vehicles.[25] The bulletin does not explain what changes were made.

118. The whine/noise condition described by GM in bulletin 22-NA-232 is further documentation of the company's knowledge that its 10-speed transmission was not sufficiently robust to account for the many gear changes encompassed by a 10x10 shift matrix—as confirmed by GM's determination that the condition can be caused by a "wear" issue (i.e., the many gear changes causing the oil pump's components to wear out over time, most often at mileages of 15,000 or more).

---

[21] GM Bulletin No.: 22-NA-232, available at https://static.nhtsa.gov/odi/tsbs/2022/MC-10227288-0001.pdf
[22] Id.
[23] Id.
[24] Id.
[25] Bulletin No.: 22-NA-232, available at https://static.nhtsa.gov/odi/tsbs/2023/MC-10239046-0001.pdf

119. On September 6, 2022, GM released Bulletin 22-NA-182, explaining that customers with 10-speed and other transmissions may complaint about "harsh shifting, shudder, surging, stalling, neutral/flare, transmission heating, [and] above normal fluid temperature."[26] In this bulletin, GM attributed the issue to a potential twisted cooler line on low mileage vehicles.[27]

120. On January 10, 2025, GM issued Technical Service Bulletin 24-NA-148 for 2024 Silverado 2500HD/3500HD and Sierra 2500HD/3500HD vehicles equipped with the 6.6L L8T gasoline engine and the 10-speed automatic transmission.[28] The bulletin addresses complaints of harsh or erratic shifting, slip/flare on upshifts, and delayed or no reverse engagement, with related DTCs including P2714 (Pressure Control Solenoid D Stuck Off) and P2732 (Pressure Control Solenoid G Stuck Off). It instructs dealers to focus diagnostics on line pressure and solenoid function and to replace or upgrade specified valve body components and associated hydraulic controls to correct internal leakage and pressure regulation concerns.

121. While Bulletin 24-NA-148 frames the repairs as routine service interventions, the prescribed valve body and pressure control hardware replacements are, in reality, consistent with the defect alleged throughout the complaint—premature valve body wear and pressure regulation failures driven by frequent gear changes and associated hydraulic cycling.

122. On September 22, 2025, GM issued Technical Service Bulletin 25-NA-255 for 2024–2025 Silverado 2500HD/3500HD and Sierra 2500HD/3500HD vehicles equipped with the 6.6L L8T gasoline engine and the 10-speed automatic transmission.[29] The bulletin addresses complaints of harsh or erratic shifting, slip/flare on upshifts, delayed engagement, and related DTCs indicating pressure control and solenoid performance issues. It instructs dealers to conduct diagnostics focused on line pressure stability, commanded vs. actual pressure, and solenoid

---

[26] GM Bulletin No.: 22-NA-182, available at https://static.nhtsa.gov/odi/tsbs/2022/MC-10228909-0001.pdf
[27] Id.
[28] GM Bulletin No.: 24-NA-148, available at MC-11014081-0001.pdf
[29] GM Technical Assistance Center (TAC), Dealer Tips and New Information Newsletter (Sep. 29, 2025), p. 11, TAC-Dealer-Monthly-Tips-and-New-Information-September-2025.pdf

operation, and to replace or update specified valve body and hydraulic control components to mitigate internal leakage and pressure regulation faults.

123. While Bulletin 25-NA-255 characterizes the procedures as standard service actions, its directive to repair and replace valve body and pressure control hardware is, in substance, evidence consistent with the defect alleged throughout the complaint: accelerated valve body wear and pressure regulation failures driven by frequent gear changes and associated hydraulic cycling.

124. On October 29, 2025, GM issued Bulletin 25-NA-334, announcing a third-generation service valve body for its 10-speed transmissions. Public reporting describes the so-called "Gen-3" valve body as being aimed at improving durability and sediment management.[30] The "Gen-3" configuration reportedly eliminates the auxiliary valve body, relocates key solenoids, simplifies internal hydraulic flow paths and harness routing, removes the internal torque bias valve (TBV) lineup on certain RPOs, and includes a revised bolt kit. The "Gen-3" units reportedly began appearing in the field around August 2025, as will be detailed further below.

125. The scope of the Gen-3 valve body changes demonstrates that the earlier valve body configuration was not robust enough to reliably handle the 10-speed transmission's high shift cadence and real-world operating demands. These sweeping hardware revisions—implemented seven years into the 10-speed's production—evidence ongoing durability and contamination/sediment control issues arising from the Transmission Defect described in this Complaint and further show that GM has continued grappling for a solution to that defect. However, as detailed below, even the "Gen 3" valve body cannot remedy the problem.

---

[30] Duramax News, "GM Confirms Gen-3 10-Speed Valve Body: What Changed vs. Gen-2 (10L60/80/90) Service Bulletin # 25-NA-334," https://www.duramaxnews.com/post/gm-confirms-gen-3-10-speed-valve-body-what-changed-vs-gen-2-10l60-80-90-service-bulletin-25-na#google_vignette

126. In addition to the service bulletins, GM has also issued recalls for its 10-speed vehicles, as addressed next.

### G. GM misrepresents the scope of the defect while issuing its first rear-wheel lockup recall.

127. On October 24, 2024, GM announced that it was recalling 461,839 of its vehicles equipped with 10-speed transmissions because "the transmission control valve may fail and cause the rear wheels to lock-up."[31] This recall was designated as GM Recall No.: N242454440 and NHTSA Recall No.: 24V-797.

128. The rear-wheel lockup recall was limited to certain of the following 2020-2022 model year vehicles equipped with diesel engines and 10L1000 transmissions:

a. 2021 Cadillac Escalade
b. 2021 Cadillac Escalade ESV
c. 2020-22 Chevrolet Silverado 1500
d. 2020-22 Chevrolet Silverado 2500
e. 2020-22 Chevrolet Silverado 3500
f. 2021 Chevrolet Suburban
g. 2021 Chevrolet Tahoe
h. 2020-22 GMC Sierra 1500
i. 2020-22 GMC Sierra 2500
j. 2020-22 GMC Sierra 3500
k. 2021 GMC Yukon
l. 2021 GMC Yukon XL

129. In its Part 573 Safety Recall Report, GM states that it "has decided that a defect which relates to motor vehicle safety may exist" in the recalled vehicles.[32] GM goes on to

---

[31] NHTSA Recall 24-V-797000, available at https://www.nhtsa.gov/?nhtsaId=24V797000
[32] Part 573 Safety Recall Report, 24V-797, p.5, available at https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V797-1282.PDF

describe the defect, explaining: "A transmission control valve in some of these vehicles may be susceptible to excess wear over time, resulting in a gradual loss of pressure within the valve that can cause harsh shifting. In rare cases, the rear wheels may experience a momentary lockup."[33]

130. GM further admitted: "If the rear wheels lock-up momentarily while driving, there is increased risk of a crash."[34]

131. GM also described the cause of the defect, explaining that the "excessive wear" can "cause a fluid leak leading to a pressure drop that causes certain valves to move unexpectedly."[35]

132. GM told NHTSA that it opened "a new investigation into the condition on July 16, 2024," after "a GM engineer submitted a report to GM's Speak Up for Safety (SUFS) program based on a customer claim that the wheels on a 2021 Sierra 2500 HD pickup allegedly locked up while towing a trailer, resulting in property damage to the vehicle and trailer."[36]

133. Notably, GM had long been on notice of the defect by its own admission. Indeed, "GM previously investigated this condition and determined that, in some applications, excessive wear in a control valve in these transmissions was causing harsh downshifting and, in rare cases, a momentary (<150 ms) lock up of the rear wheels."[37] GM claims it took no action after that investigation because "[p]rior testing and analysis indicated this lockup was not sufficient to cause a loss of vehicle control, and GM had identified no accidents or injuries associated with this condition."[38]

---

[33] Id.
[34] Id. at 6.
[35] Id.
[36] Id. at 6.
[37] Id.
[38] Id.

134. On July 29, 2024, just two weeks after GM initiated its "new investigation" into the defect, NHTSA notified GM "that its VOQ [Vehicle Owner Questionnaire] monitoring process had identified new potentially related reports."[39]

135. GM then analyzed the VOQs and field data, identifying "1,888 field reports alleging a 'lock up' potentially related to this condition."[40] GM admits that it "received these reports between January 30, 2020 and August 2, 2024."[41]

136. GM further admitted that it knew of "eleven alleged incidents potentially related to the condition, including vehicles veering off the roadway and, in some cases, incurring minor property damage," as well as "[t]hree minor injuries[.]"[42]

137. Despite acknowledging the defect and issuing a recall, GM had no actual fix for the excess wear problem. Instead, GM provided "new transmission control module software" to "monitor valve performance and detect excess wear."[43] When excess wear is detected, the software limits the transmission "to fifth gear, preventing the possibility of a wheel lockup condition, which occurs in a downshift from eighth gear."[44]

138. Once placed into fifth gear, the "driver will experience . . . sluggish or reduced propulsion."[45] This type of "reduced propulsion" condition is akin to the so-called "limp home" mode which allows vehicles to drive at a very slow rate, with the idea being that they get just enough motive power to drive off the roadway. The vehicle will remain in that limp home state until "the next key cycle."[46]

139. GM confined the recall to Silverado 1500 and Sierra 1500 vehicles built before March 21, 2022, and Silverado/Sierra 2500/3500 vehicles built before January 11, 2022,

[39] Id.
[40] Id. at 6-7.
[41] Id. at 7.
[42] Id.
[43] Id.
[44] Id.
[45] Id.
[46] Id.

asserting that later builds "were built with new transmission control software that detects excessive wear."[47] GM claims all other affected models received the software at the start of the 2022 model year.[48]

140. GM's admissions—(i) that 2022 model-year vehicles included detection software and (ii) that lockup complaints date to January 2020—demonstrate that GM knew of the defect long before announcing the October 2024 recall. A limp-home detection strategy necessarily depends on prior knowledge of the excessive-wear failure mode. Because 2022 model-year production commenced in 2021, GM would have initiated the calibration at least by 2021, and more likely earlier, given the time needed to identify root cause and develop, test, and deploy the software.

141. The October 2024 recall is demonstrably underinclusive. It stops at the 2022 model year despite documented wheel lockups in 2023 and newer vehicles, and it is limited to diesel models even though gasoline vehicles have experienced the same lockup condition.

**H. GM issues another recall 10-speed wheel lockup recall**

142. On March 6, 2025, GM announced another safety recall (GM Recall No. N242480630; NHTSA Recall No. 25V-148) addressing wheel lock-up in vehicles equipped with the 10L transmission used in gasoline applications. Unlike the October 2024 recall that covered diesel pickups with the 10L1000 transmission and reported rear wheel lock-up events, the March 2025 recall pertains to gasoline models and reports of front wheel lock-up.

143. The March 2025 recall included 90,081 vehicles of the following model and model years:

a. 2021 Cadillac CT4;

b. 2020-21 Cadillac CT5;

---

[47] Revised Part 573 Safety Recall Report, Recall No.: 24V-797, p. 7, available at https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V797-1282.PDF

[48] Id.

c. 2019-20 Cadillac CT6; and

d. 2020-22 Chevrolet Camaro.

144. GM used the same exact wording when describing the defect in its March 2025 recall announcement as it had previously employed in the October 2024 recall, stating: "A transmission control valve in some of these vehicles may be susceptible to excess wear over time, resulting in a gradual loss of pressure within the valve that can cause harsh shifting. In rare cases, the wheels may experience a momentary lockup."[49]

145. GM further acknowledged: "If the wheels lock-up momentarily while driving, there is increased risk of a crash."[50]

146. GM again described the cause of the defect using the same language as before, explaining that the "excessive wear" can "cause a fluid leak leading to a pressure drop that causes certain valves to move unexpectedly."[51]

147. GM then provided its timeline of events, stating: "On September 27, 2024, a GM brand quality manager submitted a report to GM's Speak Up for Safety (SUFS) program following notification by a driver of a 2021 Cadillac CT5 who reported that both front tires locked up while driving."[52] According to GM, the vehicle shifted into neutral following the lock-up and had to be towed "due to damage."[53]

148. GM admitted it had "previously investigated this condition and determined that, in some applications, excessive wear in a control valve in these transmissions was causing harsh downshifting and, in rare cases, a momentary (<150 ms) lock up of the wheels."[54]

---

[49] Revised Part 573 Safety Recall Report, Recall No.: 25V-148, p. 2, available at https://static.nhtsa.gov/odi/rcl/2025/RCLRPT-25V148-5827.PDF
[50] Id.
[51] Id. at 3.
[52] Id.
[53] Id.
[54] Id.

149. GM then waited approximately two months to open "a new investigation."[55] By December 18, 2024, the GM investigator "identified 115 field reports alleging a lock-up potentially related to this condition, including one alleged accident," which GM received between February 17, 2022 and November 12, 2024.[56] GM decided on February 27, 2025 to conduct the recall, which it announced in March 2025.[57]

150. GM still did not propose a hardware remedy. Instead, GM simply provided the software patch which puts the vehicle in limp home mode when excess wear is detected.[58]

151. The March 2025 recall mirrors the October 2024 campaign: the same failure mode (excessive control-valve wear), the same causal chain (pressure loss and unintended valve movement), the same hazardous outcome (momentary wheel lock-up), and the same software "remedy." This commonality confirms a shared underlying problem spanning both diesel pickups and gasoline sedans with 10L family transmissions.

152. The March 2025 recall is also demonstrably underinclusive. While GM isolated the recall to model years 2018-2022, consumers continue to report complaints in 2023 and later model year vehicles, as detailed further below.

**I. GM and its dealers purchase an aftermarket fix**

153. Long before GM announced its "Gen 3" valve body, an aftermarket supplier, Next Gen Drivetrain, Inc., warned GM that its defective 10-speed transmission posed and poses an "extreme safety problem" and offered to produce replacement valves to fix the wheel lock-up hazard.[59]

---

[55] Id.
[56] Id.
[57] Id.
[58] Id. at 4.
[59] Next Gen Drivetrain, Allison/General Motors 10-Speed Transmission Recall: How We Fixed It!, available at https://nextgendiesel.com/blogs/transmissions-101/general-motors-10-speed-transmission-recall-here-s-how-we-fixed-it?srsltid=AfmBOoqMyv5tJ68wdjpsGGoTpZ8dhWRXCtysSo9Wfg3tez6XsvOF7EVQ (Feb. 6, 2025).

154. Next Gen Drivetrain reports that it documented "hundreds of different vehicles" with defective GM 10-speed transmissions.[60]

155. Through its investigation, Next Gen Drivetrain identified what it believed to be the cause of the wheel lockup problem. Next Gen Drivetrain explained: "A combination of crosslinks in the valve body that become worse over time can trigger the transmission to apply a fourth clutch pack erroneously in some of the higher gears, causing a bind-up condition that locks the output shaft of the transmission and subsequently the rear axle."[61]

156. To fix this issue, Next Gen Drivetrain designed its own valve body upgrade kit, which features more robust parts, including: (i) "billet steel valves with high-temp O-Rings, the same used elsewhere in the transmission, to correct all major wear points" and (ii) "a separator plate that molds around the imperfections of the valve body as it heats and billet clips to align the solenoids."[62] The company likewise offers complete valve body replacements for transmissions that have undergone significant wear and require a completely new part.[63]

157. Next Gen Drivetrain reported, in February 2025, that it previously attempted to sell its valve body upgrade kits and replacement valve bodies to GM at a discounted rate, but GM refused.[64]

158. Despite GM's refusal, Next Gen Drivetrain reports that GM dealers nevertheless purchased its valve body upgrade kits and complete replacement valve bodies.[65]

159. At some point, GM's stance on the aftermarket fix apparently shifted: in July 2025, Next Gen Drivetrain reported that a person "high up" at GM called to inquire about purchasing Next Gen's replacement parts.[66]

---

[60] Id.
[61] Id.
[62] Id.
[63] Id.
[64] Id.
[65] Id.
[66] The Car Guy Online, *GM DEALERS Buy NextGen Kits Under Warranty! HUGE WIN For Owners!*, available at https://www.youtube.com/watch?v=tDxlqOkIqUc (July 25, 2025).

160. In the days following that call, approximately 60–70 GM dealers reportedly opened wholesale accounts with Next Gen Drivetrain to purchase parts.[67]

161. Next Gen Drivetrain further reported shipping roughly 400–600 valve body kits to GM dealerships.[68]

**J. GM's "Gen 3" valve body does not fix the problem.**

162. On August 6, 2025, the "Pickup Truck + SUV Talk" blog reported that GM had released a "Gen 3" valve body to "fix" the wheel lockup defect prompting the October 2024 recall, but the article made no mention of the March 2025 recall concerning the same issue.[69]

163. According to that blog post, the Gen 3 valve body replacement has a new part number: 24071206. That new part number replaced part number 24065353. This was purportedly confirmed by "a large dealership group based in Michigan."[70]

164. The blog asserted that the part had been "redesigned," yet the blog provided no technical detail that explained what changed or how any change would resolve the underlying defect. The blog instead relied on a social-media anecdote that stated that "a technician noted the new part was completely redesigned with new solenoids, new wiring and a new body design."[71]

165. The following week, GM Authority similarly reported that a "next-gen GM valve body," identified as part number 24071206 and "compatible with the GM 10L60, 10L80, and 10L90 transmissions," was arriving at dealers. GM Authority noted that it was "unclear" if this was a second- or third-generation design.[72]

---

[67] Id.
[68] Id.
[69] Esterdahl, GM Releases New Gen 3 Valve Body for 10-Speed Transmission Wheel Lock-Up Fix, available at https://pickuptrucktalk.com/2025/08/gm-releases-new-gen-3-valve-body-for-10-speed-transmission-wheel-lock-up-fix/ (Aug. 6, 2025).
[70] Id.
[71] Id.
[72] Lopez, Next-Gen GM Valve Body Now Arriving at Dealers, GMAuthority.com, available at https://gmauthority.com/blog/2025/08/next-gen-gm-valve-body-now-arriving-at-dealers/ (Aug. 15, 2025).

166. On October 29, 2025, GM issued Service Bulletin 25-NA-334, effectively confirming a third-generation service valve body for the 10L60/80/90 that purported to eliminate the auxiliary valve body, to relocate key solenoids–including moving the TCC solenoid to the case-side and mounting default/mode solenoids to the thick plate, to simplify internal flow and the harness, to remove the internal TBV lineup on specified applications in favor of an external TBV, and to supply an updated bolt kit (P/N 24073070) to account for revised bolt lengths and locations. These were all framed as durability/serviceability and sediment-mitigation updates.

167. Early field experience indicates that purported "Gen 3" valve bodies continue to exhibit in-service failures, with reports of low-mileage core returns and persistent dealership demand for aftermarket valve body kits—underscoring that GM's redesign has not resolved underlying wear and pressure-control issues.[73]

168. Independent remanufacturer Next Gen Drivetrain reports persistent in-service failures associated with the Gen 3 valve body used in GM's 10-speed transmissions. Next Gen Drivetrain's head engineer contends that the Gen 3 redesign does not adequately address internal leakage and pressure-management issues that can prevent proper valve closure under load, among other shortcomings.[74]

169. The release of GM's "Gen 3" valve body confirms what Plaintiffs allege: GM recognized durability and shift-quality problems in the 10-speed transmission. Iterative valve-body redesigns—culminating in the "Gen 3" revision—were undertaken to address field-observed wear, pressure instability, and valve mis-control that manifests as harsh or delayed shifts, limp-mode events, loss of propulsion, and wheel lockup.

---

[73] Hurd, An Engineer Explains GM's Valve Body Failure: Will A New Repair Be Enough for HD Owners?, TheDrive.com (Sep. 17, 2025), available at An Engineer Explains GM's Valve Body Failures: Will A New Repair Be Enough for HD Owners?

[74] Id

170. In short: GM's development and release of a third-generation valve body demonstrates that the company has long known its 10-speed transmission has pervasive and persistent failures requiring remediation.

171. In sum, despite the "Gen 3" release, GM has failed: (1) to disclose the true scope and nature of the underlying problems and (2) to provide an effective, system-level fix.

**K. GM is still producing, marketing, and selling vehicles with defective 10-speed transmissions.**

172. While GM has repeatedly represented that the wheel lockup defect is limited to certain 2018–2022 model-year vehicles and attributable to a discrete valve-body wear issue, the reality is far different. As summarized below and elsewhere in this Complaint, owners and lessees of vehicle models never included in the recall—as well as owners of 2023 and later model-year vehicles—have repeatedly reported wheel lockups. Likewise, owners and lessees of the Class Vehicles have reported a host of additional transmission defect symptoms, including delayed engagement, hesitation, harsh shifts, lurching, sudden engine braking, loss of power, entry into limp mode, stalling, and the other complaints detailed herein.

173. These problems are all manifestations of the Transmission Defect, defined above, that GM has yet to disclose and yet to remedy. Specifically, as previously detailed, GM failed to design, to validate, and to manufacture an integrated 10-speed transmission system that is sufficiently robust, as a whole, across its mechanical components, hydraulics (including the charge pump and valve body), and electronic/software controls to accommodate the architecture's high shift frequency, thermal loads, and the precise hydraulic-pressure and clutch-timing demands it imposes.

174. As a result, consumers continue to report transmission failures and related concerns across all model years; vehicle types–sedans, trucks, SUVs; fuel types–gasoline and diesel; and all variants of GM's 10-speed transmission. The complaints below are illustrative and not exhaustive and are included to demonstrate that GM's recalls are underinclusive and that the Transmission Defect extends across the 10L series of transmissions.

175. For instance, a 2023 Cadillac Escalade Stretch Vehicle (ESV) owner reported the same failure mode at just 14,000 miles to NHTSA:

> 10 speed transmission valve body failed with 14k miles which resulted in inability to accelerate/shift and the car would not shift into reverse. After researching this appears to be a very common problem experienced by owners of other GM vehicles with the same 10 speed transmission.[75]

176. Another 2023 Cadillac Escalade owner similarly reported a transmission valve body failure to NHTSA:

> While driving, I got a message . . . on the screen stating that transmission needed to be serviced. This was very scary as I slowed down and then was not able to put the vehicle in park and the parking brake was not able to be disengaged to be able to move the vehicle. After moving the transmission shifter back to different positions, I was then able to put the vehicle into Drive and then park it where it wouldn't move after that. Dealership now says that there is an issue with the transmission valve body that needs to be replaced.[76]

177. Another 2023 Cadillac Escalade owner reported similar transmission failures to NHTSA, requiring both torque converter and valve replacements early in the service life of the vehicle:

> 23 Escalade L87 engine and transmission issue along with rear cross traffic alert emergency breaking. @ 8600k lifter failure (repair) @ 8750k transmission toque converter replacement @10600k spark plug replacement rough idle @17k in for hard down shift transmission valve replacement @21k in for lifter and same transmission down shift issue Service advisor advised that the lifters need to be replaced again and the hard down shift failed to be fully addressed. The upper level from GM advised no remedy could be found until service bulletin could be resolved. No repair work to be performed.[77]

---

[75] NHTSA ID No.: 11660745, available at https://www.nhtsa.gov/?nhtsaId=11660745; 2023 Cadillac Escalade; Incident Date May 4, 2025; Reported May 13, 2025.

[76] NHTSA ID No.: 11661527, available at https://www.nhtsa.gov/?nhtsaId=11661527; 2023 Cadillac Escalade; Incident Date May 11, 2025; Reported May 16, 2025..

[77] NHTSA ID No.: 11659460, available at https://www.nhtsa.gov/?nhtsaId=11659460; 2023 Cadillac Escalade; Incident Date May 7, 2025; Reported May 7, 2025.

178. Another 2023 Cadillac Escalade owner reported a transmission valve body failure placing the vehicle into limp home mode to NHTSA, stating that the problem was "a real safety issue" and calling for the company to be investigated:

> The transmission needs a new valve body at 43,491 mile, and is available for inspection upon request. My safety was put at risk because I was driving on the highway at approximately 70mph, when all of a sudden I received a loss of power message on my dashboard along with the check engine light. The vehicle then shifted HARD into a lower gear and there was an obvious loss of power along with higher than normal RPMs and a severe loss of fuel economy. I had to pull over to the shoulder and turn off the vehicle for 10 minutes hoping that everything would be fine. I brought it in to the dealership today, and they confirmed that it's the transmission valve body. Previous symptoms have been hard shifts when shifting out of park, and occasional loss of power to the engine. I don't understand how it is possible for these parts to be back ordered if they are still manufacturing these transmissions for the newer 2025 models and soon to be 2026 Escalade models. This is a real safety issue aside from the engine recall fiasco that GM is under fire for. They need to be investigated for both the transmission and engine problems![78]

179. Similarly, Torque News reported that a "2024 GMC Sierra owner has a failed 10-speed transmission that is only 6,500 miles in" and was unable to obtain necessary repairs because "the dealer doesn't have the right parts."[79] The owner posted his story on Facebook and many other GM Sierra owners expressed that their vehicles experienced similar problems, including one owner whose vehicle had to be towed to the dealership after a valve body failure "with under 10,000 miles on the truck."[80]

180. Additionally, many users commented on the Torque News article describing the same defect in model year 2023 and later vehicles; examples of such complaints are quoted

---

[78] NHTSA ID No.: 11657311, available at https://www.nhtsa.gov/?nhtsaId=11657311; 2023 Cadillac Escalade ESV; Incident Date April 27, 2025; Reported April 28, 2025.
[79] Flierl, *My 2024 GMC Sierra's Transmission Died at 6,500 Miles, I've Been Waiting For the Dealer To Get Parts For Over 60 Days*, available at https://www.torquenews.com/1084/my-2024-gmc-sierras-transmission-died-6500-miles-ive-been-waiting-dealer-get-parts-over-60 (March 2, 2025).
[80] Id.

below to again confirm that the defect is not limited to the recalled vehicles, as GM has represented:

> I have a 2023 and two 2024 the transmission failed on the 2023 just under warranty and I waited, if I recall correctly, two months. Now the 2024 3500 dually transmission has thrown codes for the second time. The first time less than two months ago. I think they cleared the codes and now they are back and it it's something to do with the transmission. I need these trucks for work and they are under contract for work. I'm waiting for the third truck to start with the transmission nightmare next. At first the truck indicated it was not in park although I shifted the lever to the park position.
>
> ***
>
> 2023 silverado 1500 5.3 with 10 speed transmission failed 27800 miles. Local dealers have 3 plus months backlog for repairs. No loaner until vehical is inspected 2 to 3 months. Local transmission shop rebuild 2.5 weeks. $7430.00. Torgue convertor likely cause problem.
>
> ***
>
> My 2024 Silverado has been at the dealership for a month waiting for transmission valve body. It has a little over 11,too miles on it. I'm not a happy camper. Is there anything I can expect from GM for the loss of my truck?
>
> ***
>
> I have a 2024 GMC Sierra with 6100 miles. 3 times it runs at reduced engine speed and the transmission shifts really rough. Also wouldn't go into reverse. Dealers says parts are ordered and it's been over a week. Truck is not driveable. I drive long distances for work and afraid now even after if/when fixed it will be reliable. BTW switched from a RAM that I never had one problem with.
>
> ***
>
> I have the same truck, same issue. It has been in the shop for 5 months and they still don't have transmissions to replace the defective units. I wish you the best of luck
>
> ***
>
> Have a 2024 Silverado 2500 with 6.6 gas and 10 speed... Needed a new transmission at 1100 miles. Truck was out of commission for 2 months, had several trips planed towing the camper and had to use a 1/2 ton rental, so I beat the Sh** out of that.
>
> ***
>
> I have a 2024 Sierra with 8,000 miles on it has been at the dealer for the transmission sinve December 6. Today is March 4. To their credit, the dealer gave me new sierra loaner.
>
> ***
>
> My 2024 GMC Sierra Pro transmission stopped working on January 26, 2024. Truck could not go in reverse and in drive wouldn't go faster than 5 mph. The dealership has had the vehicle since January 27. I was told the part is on back order with no date of delivery. They gave me a rental vehicle a GMC terrain, not

a truck like I bought because I need a truck. I opened up a case with GM and they keep giving me the run around that they are monitoring my case and will update me when they hear anything on the part being shipped. I need a truck and my brand new truck only had 9,400 miles on it and it is now been over a month and my truck is sitting there. GMC needs to make this right at this point reimburse me the full amount of my truck plus the amount I spent for a bed liner and let me go purchase a truck that works.

***

Bought a 2024 GMC Sierra one year ago. It has around 12,000 miles. It has been at the dealer in Lee Summit Missouri for almost a month. It needs the valve body replaced. I'm being told the part is in high demand and they are not sure when they can get one.

***

2023 GMC at4 diesel. Transmission went out at 32,0000 miles they replaced it with a new transmission and it went out at 64000 miles. GM said it would be at least 8 months for a repair or replacement. I had to trade it for a different truck. Obviously not a GMC. So I lost money on trading a truck in with no transmission. I filed a claim with GM and it's been over a month with no answer. Had 2022 GMC 3500 that was in shop all the time also. Never buying gm again

***

I have a 2024 Silverado 5.3 10 speed driving down the road all of a sudden about steering wheel because my transmission dropped out of high gear down to low gear and I lost my reverse. I only have 17,000 miles on it and it only had it about 6 months.
No ship date on part in sight been sitting at the dealership now for six and a half weeks and frustrated as hell

***

I bought a brand new 2024 Silverado with 11 miles on it. It is currently at the dealership for the same issue, transmission control valve, 10,042 miles. I was told no ETA on part, national backorder, and to expect waiting 2-6 months. When I dropped it off almost a month ago there were 8,500 on backorder. I spoke to them a couple days ago and there were 6,100 on backorder. I did contact GM customer service and started a "work order/ claim ticket" but that's gotten absolutely nowhere.

***

Our 2024 gmc sierra 5.3 10 speed transmission had a failed valve body at 9 thousand miles they had no eta on the part either it sat for a month at the dealer I filed a lemon law claim I guess it sped things up

***

2024 Sierra 1500 5.3L wouldn't go into reverse and shift out of 1st gear. Took to dealer waiting 2 weeks no rental reimbursement or anything. Said valve body needs replacement. Parts are on order. I had a 2018 Elevation 1500 Sierra with slipping transmission so I thought a 2024 would fix the issue. I'm very disappointed at GM. My father worked 35 years at Flint michigan plant and this is the service I get. I'm a loyal GM fan but not so much now.

***

Bought my 2024 GMC Sierra 5.3 in April 2024. On December 23,2024 my transmission refused to switch to reverse and would only operate in drive at low speeds(possibly unto 4Speed). I drove at low speed to GM dealer and has been there since. Today is March 9,2025. Truck only had 14k on it. Every time the dealer calls for an update, which is every 2 weeks, there is no update and no eta on the arrival of the part (Valve body). At least they are supplying a rental truck-2025 Ram

***

I picked up my brand new 2024 GMC 2500 heavy duty pick up. I ordered it new from the factory. It arrived after about three months. It was about a 20 mile drive home and the transmission was acting up before I got home. It went back to the shop and it took about two months for them to get the new valve body. I do a lot of traveling to a large fifth wheel and I'm always worried about this transmission and having a breakdown when I am away from home.

***

My 2024 Silverado only had 4800 miles on it when it went out. 8 weeks in the dealership till they got a new transmission for it but now I am afraid to take it anywhere because who knows what this one will do. Still no compensation for the time in the shop did not pay anything payments or my insurance for two months going to contact my attorney done playing around.

***

I bought a new 2024 Sierra Elevation with a 5.3L. Same problem after 8000 miles. "Blown valve body" Parts are on back order and I could be waiting up to 3 months for my truck. The dealership has given me a loaner vehicle in the meantime, but time is ticking away on the warranty while I wait.

***

While I was 800 miles from home, my 2023 GMC Sierra 1500 Denali with 23,000 miles transmission died. Truck has been in a shop for over a week with no idea of when they will get a Valve body to fix the truck.

***

I just got a newer 2023 3500 deisel [sic] denali ultimate. I love it but just had to get it towed due to the transmission valve cover. I'm currently in a rental car. They don't know how long it will be until they get the part. We've upgraded my truck painted mirrors replaced fenders put 6 inch lift etc. Didn't see engine issues in my future at all. I'm speechless

***

2024 gmc 17,000 miles tranny out said would be at least 3 weeks for parts as they are on national back order tried to trade it off dealer didn't want to do much for me I didn't take there offer

***

I have a 2023 AT4HD 3500 with the Allison 10 speed. Broke down with 33,800 miles on it. Broke down 27 March 2025. Going on 7 weeks now without my truck. Gave me a Hertz Malibu to drive. The Malibu doesn't even begin to perform in the manner for which I bought it for. No one can tell me when I will get my truck

back. The part number for the valve body has been changed by GM 3 times since the truck broke down. The truck now sits at a dealer 90 miles from my home because GM wouldn't pay to have it towed to the dealer where I bought it from. Was told by a source at a dealer to expect 2 to 4 months to get truck back. There are other trucks sitting for same problem at dealers. Was told several have been the for 3 months already. Not a happy camper!

***

I own a 2023 GMC 2500 SLT HD Duramax with < 30K miles. Up until last weekend my wife and I love the truck. It just went into the shop and I'm told it needs a valve body. Worse, there's no ETA on the part and 2 trucks ahead of me have been sitting for 30 days. I'm shocked and dismayed that it's acceptable that my $80K truck will sit for 30 days or more because GM mismanaged parts inventories. It's shocking to me that GM obviously has the parts… as they are continuing to produce new vehicles and generate sales… while my truck that I'm making payments on is sitting idle. Worst, my wife and I are having to cancel a vacation we've planned for one year because of this. Can I rent an HD and proceed? Maybe. But GMC only covers $44 per day against a $150 per day rental. I have to say… I'm a fairly simple person. I researched this truck and bought instead of Ram and Ford because of the reported reliability. To me, this is stealing. GMC should not be producing new vehicles with parts that are needed to meet their obligations to current owners.

***

I have a 2024 gmc 3500 with a transmission that has gone out. Dealership says they don't know when they might be able to get one. I there a class action lawsuit pertaining to this in play already? How do I join in on it if so?

***

Unfortunately, my 2024 GMC Sierra 1500 experienced a transmission failure about an hour ago with only 11,000 miles on it. While driving, the check engine light came on, the vehicle lost power, and a warning message appeared instructing me to drive slowly and take the truck in for service. I pulled over to the shoulder, and when attempting to reverse, the transmission would not engage. A tow truck is currently en route to transport the vehicle to the GMC dealership. I'm hopeful they'll be able to diagnose and resolve the issue promptly.

***

I have a 2024 GMC Sierra 1500 Pro series, 5.3L and 10 speed transmission. I currently have 23XXX miles on it and it is currently in the shop. This the 3rd or 4th time I have brought it in for shuddering. It happens between 30 -50 mph when I let off the gas a little. I have been told that they could not duplicate the problem the first time and then the last shop visit was told it is caused by the feature which shuts off 4 of the 8 cylinders. I knew that was BS. If that feature is what caused the shudder then EVERY truck with that would be doing it. This time I was told they are thinking it maybe transmission related. I will see. I am considering lawyering up

***

> Just took my 2024 GMC Sierra 1500 Denali with 7,000 miles to the dealership today with transmission issues. They told me to please be patient that they have no idea when they would be able to get the replacement parts.
>
> ***
>
> My truck's transmission went May 15 2025, a 2023 Sierra I bought new about the end of July 2023. It's been 67 days! And today, July 21, I was just called and told the part is in, and "should" have the truck back this week. To date, GMC has paid for the rental, which was a headache in itself to get a proper replacement. Besides that, we have made about $2,761 in payments on a vehicle we haven't been able to use.[81]

181. Similarly, one 2023 Cadillac CT5 owner reported that their vehicle suffered the exact same problem that prompted the March 2025 recall of earlier model year CT-series vehicles to NHTSA. That owner stated:

> We just purchased this 2023 Cadillac CT5 from Cadillac of South Charlotte and took delivery by long haul truck at our home in Seymour, TN on [XXX]. It had 40,744 miles on the odometer. We drove the car approximately 12 miles when suddenly the car went into reduced power mode where it would not shift past 4th or 5th gear limiting our speed to approximately 45 miles per hour. We drove slowly to the closest GM Service location that was just a few miles away and during that time the message started alternating to another message that said the transmission was about to seize. At that point we had the car towed to Cadillac of Knoxville and the next day they told us that the transmission control valve body was bad. I have since learned that General Motors has recalled over 90,000 vehicles due to a transmission control valve issue that can cause the wheels to momentarily lock up, increasing the risk of a crash. Supposedly the affected models include just the 2020-2021 Cadillac CT4, CT5, 2019-2020 Cadillac CT6, and 2020-2022 Chevrolet Camaro, with notifications to start being sent to owners this month mid-April. The recall for that issue according to what I read is to program the car to monitor the transmission and if it starts to fail to go into a reduced power mode. This is what my 2023 CT5 has just experienced. The Service Consultant at the dealership said they had ordered the part but that it was back ordered with no expected delivery date. Our new car is dead at the dealership. Everything I have read says GM is not fixing the defect in these transmissions. They are replacing the part with the same defectively designed part and transmissions that have been "fixed" are soon returning having to be "fixed" again. My vehicle is not covered by the most recent recall. Please take steps to

[81] Id.

> expand the recall because they are still using the same transmissions and nothing has been done to fix the design flaw with them.[82]

182. Another 2023 Cadillac CT5 owner reported a similar problem to NHTSA. This owner reported this in a vehicle with just 22,000 miles:

> At 22,000 miles, driving along at approximately 40mph, vehicle felt like it surged - check engine light went on and message of "limited acceleration - drive with care" appeared. Key cycled the car, CEL and message remained. Car would then not drive higher than 3rd or 4th gear and at limited speed as I tried to get it home. Once I pulled into my driveway message appeared "Service Transmission Now - Unable to Shift Soon." Car would then not move when shifted into any gear, including reverse. Had vehicle towed to dealer where they found the transmission valve body needed to be replaced. There are no available parts anywhere in the country and was told this could be a long wait for repair. Upon searching, there are 2020-22 GM vehicles with similar issues like Chevy and GMC where they have recalled the valve body, but the 2023 Cadillac CT5-V is not included in this and likely should be. My dealer told me my CT5 is not the only one they have currently waiting on this exact part.[83]

183. Another 2023 Cadillac CT5 owner reported that their vehicle began accelerating unintendedly before decelerating without warning on the interstate and that the dealer diagnosed the problem as a "faulty" transmission:

> The contact owns a 2023 Cadillac CT5. The contact stated while driving 70 MPH, the vehicle started to accelerate independently, exceeding the speed and then the vehicle decelerated without warning. The contact was able to pull over. The vehicle was towed to the dealer and stated that the transmission was faulty, and the anti-lock braking turned off inadvertently. The vehicle was repaired. The manufacturer was contacted, and a case was filed. The failure mileage was 130,000. The VIN was not available.[84]

---

[82] NHTSA ID No.: 11652706, available at https://www.nhtsa.gov/?nhtsaId=11652706; 2023 Cadillac CT5; Incident Date April 2, 2025; Reported April 4, 2025.

[83] NHTSA ID No.: 11661103, available at https://www.nhtsa.gov/?nhtsaId=11661103; 2023 Cadillac CT5; Incident Date April 27, 2025; Reported May 15, 2025.

[84] NHTSA ID No.: 11494586, available at https://www.nhtsa.gov/?nhtsaId=11494586; 2023 Cadillac CT5; Incident Date Nov. 19, 2025; Reported Nov. 22, 2025.

184. Another 2023 Cadillac CT5 owner reported their vehicle experiencing a transmission valve body failure when their vehicle was under 18,000 miles:

> I purchased a 2023 Cadillac CT5 from a Cadillac dealership in Cleveland, Ohio on June 24th, 2025 with slightly under 18K miles. On July 30th, I took the car to a local Cadillac dealer due to on a few occasions, while driving down the highway, the car went into "decreased acceleration, drive with care". The service department said the Cadillac had over 90k recalls for the transmission body valve and the backlog for the part was significant, in some cases I read over a year. I hadn't even made one payment yet, and now it's in the shop for who knows how long. Shouldn't the consumer be protected? I was not made aware of any recalls, and the dealership is denying any wrong doing since the carfax report was clean. This is not ok. I am requesting a buy back, but may need to involve legal counsel.[85]

185. Likewise, Chevrolet Suburban owners have submitted the following complaints to NHTSA:

> Went into limp mode on 11/6/25, took to the dealership where they found metal shavings in the oil due to a "stuck solenoid 'A'". Originally said that I'd need a whole new transmission, decided to do the cheaper easier repair and just replaced the valve train (not my choice) got it back on 11/13/25. On 11/24/25 I was on a very busy highway, at a red light, hit the gas when the light changed and the car didn't move. Just revved the RPMs, then it suddenly lurched/surged forwards. Took it back to the dealership and they said "it doesn't have any codes showing". This is not normal behavior for a 4 year old vehicle with less than 40k miles on it.[86]

> 2023 Chevy Suburban transmission control valve failures causing wheel lockup or deceleration causing the vehicle to be unsafe to operate. Chevrolet refuses to acknowledge.[87]

> Transmission malfunction. This has appeared several times at highway speeds and low speeds. We have dad to limp along in the slow lane to exit ramp and take back roads to the nearest dealership. The current problem has been confirmed

---

[85] NHTSA ID No.: 11679277, available at https://www.nhtsa.gov/?nhtsaId=11679277; 2023 Cadillac CT5; Incident Date July 30, 2025; Reported Aug. 8, 2025.

[86] NHTSA ID No.: 11701425; 2021 Chevrolet Suburban; Incident Date: Nov. 24, 2025; Submitted: Nov. 25, 2025, https://www.nhtsa.gov/?nhtsaId=11701425

[87] NHTSA ID No.: 11691800; 2023 Chevrolet Suburban; Incident Date: Oct. 6, 2025; Submitted: Oct. 7, 2025, https://www.nhtsa.gov/?nhtsaId=11691800

with error codes P0747. The dealership has scanned this vehicle and detected error codes in the past on two different occasions and found P176C in TCM on 08/01/23 and P17D6 on 10/24/24. Check engine light comes on with a screen prompt "Reduced Acceleration Drive with Care". The transmission valve body has already been addressed once because of triggering limp mode.[88]

The vehicle only has ~39,000 miles on it and the transmission went out and the car is not drivable. The dealership said it is a faulty valve body and that the part is on national back order and could take 2 to 6 months or even longer to get the part before they can start work.[89]

This vehicle shifts hard and was identified to have a transmission valve issue. It should be under the same recall that other Chevrolet vehicles have with same issue. On top of this, Chevrolet cannot keep up with demand for this part making only 500 per week. I've been told it may be 2 months before I have my vehicle back.[90]

There is an issue with the transmission when i accelerate at a slow pace. The car shakes and vibrates. Theres a possibility of an issue with the transfer case 4x4. When i turn the steering wheel and drive, it feels like it locks. It feels like 4x4 is on and theres a odd sound as well. I took my car to Hamilton Chevrolet and paid for inspection. They told me that there was no issue, but the issues i mentioned earlier in this message was mentioned to them. Those issues are still occurring. This is a recall issue but when i put my VIN number in, my car shows that there is no recall on it. There was many people who mentioned this problem.[91]

Our 2022 suburban with the diesel motor has had 3 separate incidents where by all accounts the wheels have locked up while driving. The incidents mirror what has been described in the recall N242454440. The first time the incident occurred, we were driving while towing a light load (boat ~2500 lbs) at a steady speed of 60 mph. While driving the vehicle shook violently once, and then again about 2-3 seconds later. I immediately pulled over suspecting that maybe there was an issue with our trailer. After finding nothing we drove home without incident. Shortly after this incident we had the transmission flushed for regular maintenance at about 50,000 miles. Approximately 5-6 months later the second

---

[88] NHTSA ID No.: 11685156, 2023 Chevrolet Suburban, Incident Date: Sep. 4, 2025; Submitted: Sep. 4, 2025, https://www.nhtsa.gov/?nhtsaId=11685156

[89] NHTSA ID No.: 11683979; 2024 Chevrolet Suburban, Incident Date: Aug. 12, 2025; Submitted: Aug. 12, 2025, https://www.nhtsa.gov/?nhtsaId=11683979

[90] NHTSA ID No.: 11677114; 2023 Chevrolet Suburban; Incident Date: May 6, 2025; Submitted: July 29, 2025, https://www.nhtsa.gov/?nhtsaId=11677114

[91] NHTSA ID No.: 11673837, 2021 Chevrolet Suburban; Incident Date: June 1, 2025; Submitted: July 15, 2025, https://www.nhtsa.gov/?nhtsaId=11673837

incident occurred. While driving with no trailer, up a mountain in NC at a steady speed of 35 mph, the vehicle shook violently and then again approximately 2-3s later. Each time the vehicle shook a loud "BUMP" noise would be heard. The road was smooth and was later driven on without issue so it was not the terrain. I once again got out and inspected the vehicle and was unable to find an issue. We drove to where we were staying and immediately took the vehicle to a dealer the following day to be inspected. The dealer found no issues and we did not report any similar problems. The last incident occurred after another 8 months while towing a light utility trailer at a steady speed of 60mph. Same thing happened with a shake and loud BUMP. However this time it was not followed immediately by an other instance. Those came approximately a minute later and then again after about 10 more minutes. I cannot recreate the issue and it seems to be at complete random and is happening while driving steady rates of speed where the transmission shouldn't be trying to shift. It seems like a safety hazard that could cause an accident.[92]

Check engine light came on Then : message saying power reduced. Then: Service transmission, unable to shift soon. While driving on the highway. Vehicle has been at dealership for a month with no idea on when parts will be available. They say they have no idea on when a valve body part will be available.[93]

While driving at normal highway speed, the vehicle speed is suddenly reduced and it feels and sounds like the transmission has shifted into low gear. The following warning light activated: Reduced Acceleration Drive with Care. The GM dealership service center stated that the transmission control valve body needed to be replaced. They indicated that this was a known issue. I believe a safety recall should be issued for this defective part.[94]

Transmission valve control failed. Rear wheels locked up. Vehicle downshifted quickly. No injuries. Vehicle is at dealership for repairs. No warnings.[95]

I'm filing this complaint regarding a serious safety concern with my 2023 Chevrolet Suburban. The vehicle is affected by NHTSA Recall 25V274 related to a potential defect in the crankshaft or connecting rods. GM has confirmed the recall, but there is currently no fix available, and dealerships are not equipped to

---

[92] NHTSA ID No.: 11673702; 2022 Chevrolet Suburban, Incident Date: July 13, 2025; Submitted: July 15, 2025, https://www.nhtsa.gov/?nhtsaId=11673702

[93] NHTSA ID No.: 11664813; 2023 Chevrolet Suburban; Incident Date: May 7, 2025; Submitted: June 4, 2025, https://www.nhtsa.gov/?nhtsaId=11664813

[94] NHTSA ID No.: 11662243; 2021 Chevrolet Suburban; Incident Date: March 10, 2025; Submitted: May 20, 2025, https://www.nhtsa.gov/?nhtsaId=11662243

[95] NHTSA ID No.: 11658863; 2023 Chevrolet Suburban; Incident Date: March 8, 2025; Submitted: May 5, 2025, https://www.nhtsa.gov/?nhtsaId=11658863

inspect the engine to determine if it's defective. This leaves us driving a vehicle with a known risk of sudden engine failure, especially at highway speeds or while towing. In addition, my vehicle is also experiencing a transmission issues and is expected to be in the shop for up to three months for repairs. The combination of an unresolved engine recall and a failing transmission makes this vehicle unsafe and unreliable. We are a family of six with four small children (two in car seats, two in boosters). We purchased this Suburban specifically for safety, towing capacity, and long-distance driving. Right now, we are left without a safe or functional vehicle. GM refuses to provide a comparable rental and has offered only $44/day, which doesn't cover anything close to what we need. We've attempted to work through GM and our local dealership to resolve the issue, but we've been passed back and forth with no solution. I'm concerned that GM is knowingly allowing vehicles with unresolved safety defects to remain on the road with families inside them. I'm asking NHTSA to investigate the handling of this recall and the delays in the transmission repair that are putting families like mine at risk.[96]

On January 29, 2025, while my wife was driving our 2022 Chevrolet Suburban with a 6.2L gas engine on a state highway, the vehicle suddenly lost acceleration and power to the wheels while accelerating to the posted 55 mph speed limit. This occurred without any prior warning, creating a highly unsafe situation in morning commute traffic. The vehicle was immediately taken to a Chevrolet dealership, where the issue was diagnosed as a failed transmission control valve. This failure, which resulted in a complete loss of power while driving at highway speeds, is a known defect affecting certain GM models. The part in question, the Transmission Control Valve, is currently in high demand and is on a national backorder due to numerous similar failures. A recall has already been issued for diesel engine models with the same problem, but no recall exists for the gasoline-powered versions like ours. Chevrolet has confirmed the diagnosis and is aware of the issue, but the replacement part is currently on a national backorder, and the repair has been delayed indefinitely. Since the incident, the vehicle has been undriveable, causing significant inconvenience, and Chevrolet has been unable to provide an estimated date for repair. The sudden loss of power created a dangerous situation on a busy highway, as there were no warning lights, messages, or symptoms prior to the failure. This is particularly concerning given that the part involved is on backorder due to the widespread nature of the issue. Chevrolet's lack of a clear repair timeline, coupled with the fact that this issue has been identified in other models, raises questions about the company's response and whether a broader recall or safety bulletin will be issued for vehicles like

---

[96] NHTSA ID No.: 11658035; 2023 Chevrolet Suburban; Incident Date: April 30, 2025; Submitted: April 30, 2025, https://www.nhtsa.gov/?nhtsaId=11658035

ours. The vehicle's failure has not only been a major inconvenience but also a safety concern, highlighting the need for urgent attention to address this defect.[97]

History of transmission shifting issues shortly after purchase (CPO from Dealership). Vehicle was taken to two separate dealerships, several times for this issue while still under the 100,000 mile CPO warranty. Dealerships claimed they could not replicate the issue, however problem continued. Now at 1198xx miles, the transmission failed while driving. was accelerating from stop and and the vehicle bucked, the rpms jumped, the service indicator illuminated, and when the vehicle stuck in limp mode. I spoke with one of the dealerships and explained the history and suggested my vehicle failure was exactly as described in the safety recall and they informed my VIN was not included in any recall or service campaign and the could do nothing for me. I called the GM customer service number, pled my case and was told the same thing[98]

The value body failed for the 2021 Suburban in December, causing engine power reduction and the engine transmission was not shifting properly.[99]

On 12/28/2024, while accelerating on the highway, I received without warning a reduced engine power warning and the RPM's were racing when I depressed the gas pedal. I was in moderate traffic in excess of 55 MPH and had difficulty safely making it to the right shoulder of the roadway as traffic was passing by at a greater rate of speed than I was able to travel. The vehicle would not go more than 30-35 MPH and it would not go into reverse after I was able to make it to a safe location. It was towed to a local dealership where I was later advised it was a transmission issue (valve body). The vehicle remains at the dealership awaiting repair as there is a large backorder for the valve body (I was told 8 at this point).[100]

VEHICLE TRANSMISSION BANGS AT 50-65MPH SO MUCH SO THAT THE VEHICLE GOES INTO LIMP MODE. CODE APPEAR ON DASH, MUST SHUT TRUCK OFF AND WAIT ON SIDE OF ROAD TIL GOES BACK TO NORMAL IDLE. RESTART VEHICLE, THE ENGINE LIGHT STAYS ON FOR THE NEXT 3 STARTS THEN CLEARS TIL IT HAPPENS AGAIN.[101]

---

[97] NHTSA ID No.: 11656943; 2022 Chevrolet Suburban; Incident Date: Jan. 29, 2025; Submitted: April 26, 2025, https://www.nhtsa.gov/?nhtsaId=11656943

[98] NHTSA ID No.: 11652215; 2021 Chevrolet Suburban; Incident Date: March 30, 2025; Submitted: April 2, 2025, https://www.nhtsa.gov/?nhtsaId=11652215

[99] NHTSA ID No.: 11636720, 2021 Chevrolet Suburban; Incident Date: Jan. 17, 2025; Submitted: Jan. 18, 2025, https://www.nhtsa.gov/?nhtsaId=11636720

[100] NHTSA ID No.: 11636621, 2022 Chevrolet Suburban; Incident Date: Dec. 28, 2024; Submitted: Jan. 17, 2025, https://www.nhtsa.gov/?nhtsaId=11636621

[101] NHTSA ID No: 11626024; 2022 Chevrolet Suburban, Incident Date: Nov. 11, 2024; Submitted: Nov. 18, 2024, https://www.nhtsa.gov/?nhtsaId=11626024

> 2019 Chevy Suburban Premium at approx 121k miles whole body of vehicle starts shaking & vibrating at 45 mph, behaving like like torque converter going bad. Transmission intermittently acts like its slipping in 2nd & 3rd gear, when it does catch it shifts VERY hard. ..No dash lights. No warnings. Nothing....[102]

> Multiple issues with transmission since owned. It randomly goes into "limp" mode and everything will blink and it won't start back. The transmission has always shifted hard and sounded funny they told me if was normal for the vehicle. Leaking transmission fluid when owned for 4 months. I have had to the dealer multiple times, several repairs, told it is safe to keep driving by GM. The inverter is bad and told me it was ok to drive until they can repair. GM will not give me a fair response or answer. The dealership won't buyback, and offered to purchase for nearly 30k less than I bought it for 18 months ago brand new. The engine light comes on and off randomly told me it was ok with a diesel it may do that when it gets cold.[103]

186. The complaints above are illustrative examples of an unmistakable pattern: across makes, models, model years, and engine types owners report the same recurring transmission failures. This uniformity confirms the commonality of the Transmission Defect throughout GM's 10-speed transmission family.

## IV. The Limitation Periods are Tolled.

187. **Discovery Rule.** Any applicable statutes of limitations have been tolled by virtue of the delayed discovery rule because the defect at issue is a highly technical issue and Plaintiffs could not have learned of it because they did/do not have access to GM's proprietary information about the design and performance of the Class Vehicles.

188. **Concealment.** Any applicable statutes of limitations have also been tolled by GM's active concealment of the facts alleged throughout this complaint. Plaintiffs and the Class could not have reasonably discovered the true nature and scope of the transmission defect prior to this class action litigation and the ensuing discovery.

---

[102] NHTSA ID No.: 11584177; 2019 Chevrolet Suburban; Incident Date: April 18, 2024; Submitted: April 20, 2024, https://www.nhtsa.gov/?nhtsaId=11584177

[103] NHTSA ID No.: 11503779; 2021 Chevrolet Suburban; Incident Date: Dec. 29, 2021; Submitted: Jan. 26, 2023, https://www.nhtsa.gov/?nhtsaId=11503779

189. GM was and remains under the continuing duty to disclose the true character, quality, and nature of the Class Vehicles. This duty includes the true and complete scope and extent of the defective nature of the 10-speed transmissions in the Class Vehicles, which will require costly repairs, present safety hazards, and diminish resale values.

190. As a result of GM's active concealment of the true scope and extent of the defective nature of the 10-speed transmissions, any applicable statutes of limitations have been tolled.

191. GM knew of the defective nature of the 10-speed transmissions installed in the Class Vehicles before they were offered for sale, and GM has concealed this fact to the present day. GM has failed to notify Plaintiffs and the Class of the true scope and extent of the defect. GM has so failed even when consumers directly inquired with GM, GM Customer Assistance, GM service centers, and GM dealerships. Rather than disclosing the full scope and extent of the defect, GM has told consumers that the transmissions have no defect, has shifted blame to drivers by attributing issues to "driving habits" or "misuse," and/or has offered only superficial "band-aid" measures—such as a software reflash—falsely representing that these measures would resolve issues that GM knows are far more fundamental. GM has also instructed its dealerships and service personnel to do the same.

192. GM continues to conceal the true scope and extent of the 10-speed transmission defect to this day.

193. **Estoppel.** GM was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. GM actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class Members reasonably relied upon GM's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## V. Class Action Allegations

194. Plaintiffs bring this action, pursuant to the provisions of Federal Rule of Civil Procedure 23, on behalf of themselves and the following proposed class:

**California Class:**

All persons or entities that purchased or leased Class Vehicles within California.

**California Consumer Subclass:**

All members of the California Class that acquired the Class Vehicle primarily for personal, family, or household purposes.

195. Excluded from the Class are individuals who have personal injury claims resulting from the defective 10-speed transmissions in their Class Vehicles. Also excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates, GM dealers, Class Counsel and their employees, and the judicial officers and their immediate family members and associated court staff assigned to this case.

196. **Numerosity—Fed. R. Civ. P. 23(a)(1).** The members of the proposed California Classes are so numerous that joinder of all members is impracticable. Although the precise number of Class members is presently unknown, GM's sales, lease, warranty, and registration-related records will permit identification of Class members.

197. **Typicality— Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were injured in the same way through GM's wrongful conduct in selling and concealing the 10-speed transmission defect.

198. **Rule 23(b)(3) Commonality & Predominance—Fed. R. Civ. P. 23(a)(2) & 23(b)(3).** Questions of law and fact common to the Class predominate over any questions affecting only individual members, including: whether the 10-speed transmission contains a common defect; whether the defect creates safety, reliability, durability, drivability, and value-related issues; whether GM knew of the defect and when; whether GM had a duty to disclose the

defect; whether GM's representations and omissions were material; whether GM's conduct violated the laws asserted herein; and whether Plaintiffs and Class members suffered common forms of injury, including overpayment and diminished value.

199. The common issues will drive the resolution of the litigation in that their determination will resolve in one stroke issues that are central to the validity of each Class Member's claims.

200. The factual and legal issues identified above (a) remain common to the Class, (b) arise from a common course of conduct and systemic policy decisions made by Defendants, (c) predominate in number and importance over questions that may not be common to the class, and (d) preclude neither class-wide calculation of damages nor the methodological determination of how such damages should be allocated among Class Members.

201. **Adequacy of Representation— Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained competent and experienced class counsel with specific experience in litigating defective automobile cases; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

202. **Ascertainability.** Class members are ascertainable through objective criteria, including whether they purchased or leased a Class Vehicle within California during the relevant period. Class membership can be determined from GM's and third-party records, including sales, lease, warranty, service, and registration-related records.

203. **Predominance.** The common issues identified above are subject to common proof and predominate over individualized issues because the case centers on GM's common transmission design, GM's common knowledge, GM's common omissions and representations, and the common economic injuries that resulted and result from the Transmission Defect.

204. **Superiority.** The proposed class action is superior to the other means available to the Class to obtain relief. Defendant has no facially plausible interest in defending against

separate, geographically-dispersed claims, and, in fact, that would be more burdensome to Defendant than defending against all potential claims in a single forum and proceeding. Likewise, the judicial system has no interest in burdening a number of courts when the claims of this highly cohesive class can be fairly and efficiently concentrated and managed by this Court.

205. **Rule 23(b)(2) Injunctive and Declaratory Relief—Fed. R. Civ. P. 23(b)(2).** GM has acted and/or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole.

206. **Particular Issues—Fed. R. Civ. P. 23(c)(4).** Any or all of the issues identified above are appropriate for certification pursuant to Rule 23(c)(4) because each is particular and common to the Class and the resolution of each or all would materially advance the disposition of this action and the parties' interests. Certification of particular issues would move the litigation forward efficiently. This would save money, time, and judicial resources for all involved. It would save these resources regardless of whether the action as a whole might be certified.

## VI. Counts

207. Plaintiffs plead their common-law and restitution theories in the alternative to the extent any express contract, warranty limitation, or statutory remedy is deemed inapplicable, unavailable, or inadequate as to any Plaintiff or Class member.

208. Plaintiffs seek damages where authorized by law and seek injunctive relief to prevent continuing concealment and misleading representations. Plaintiffs seek restitution only to the extent the Court determines that legal remedies are inadequate as to some portion of the harm alleged, and Plaintiffs do not seek duplicative recovery of the same past economic loss under both legal and equitable theories.

### Count I:
### Unfair Competition Law

209. Paragraphs 1 through 208 are realleged.

210. Plaintiffs bring this claim on behalf of themselves and the Class.

211. California's Unfair Competition Law (Cal. Bus. & Prof. Code section 17200, et seq.) (UCL) proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

212. GM's conduct, as alleged above, was and remains in violation of the UCL in at least the following ways:

a. By knowingly and intentionally concealing the defective condition of the 10-speed transmissions while obtaining money from those who purchased and leased the Class Vehicles;

b. By marketing and advertising the Class Vehicles as having functional, safe, reliable, efficient, and high-performing powertrains and transmissions;

c. By refusing or otherwise failing to repair and/or to replace the Class Vehicles' defective transmissions;

d. By violating federal laws, including the Motor Vehicles Safety Act and NHTSA regulations through its failure to recall and repair the vehicles containing a safety defect; and

e. By violating other California laws, including California laws governing false advertising and consumer protection.

213. GM's conduct also and separately violated the UCL because GM sold and leased the Class Vehicles at an inflated price while omitting material facts concerning the Transmission Defect; marketed the Class Vehicles in standardized materials as safe, reliable, durable, and fit for ordinary driving use while omitting the defect; and continued to conceal information relevant to defect, knowledge, and repair feasibility. Under these independent theories in this paragraph, Plaintiffs cite GM's post-sale service conduct, technical materials, and recall-related conduct as evidence of defect, knowledge, materiality, causation, and concealment, not as independent private causes of action.

214. Despite having numerous opportunities to disclose the Transmission Defect, GM omitted and concealed it from Plaintiffs and the Class through every channel of information by which Defendant markets and sells the Class Vehicles. These channels include Defendant's website; advertisements across online, television, and print media; pamphlets and brochures; and GM's authorized dealerships, which are trained by GM and required to convey GM-mandated information regarding its vehicles to prospective purchasers. GM utilized none of these channels to disclose the Transmission Defect, notwithstanding ample opportunity to do so.

215. GM's conduct offends established public policy because it concealed and omitted a material safety defect that directly impairs the reliability, controllability, and performance of the Class Vehicles. As alleged herein, the transmission defect can cause the vehicles to hesitate when merging into traffic, stall or "lockup" while in operation, and otherwise expose drivers, passengers, and other motorists to an unreasonable risk of crash, injury, and death. Any utility associated with GM's sale of the Class Vehicles equipped with the defective transmissions is substantially outweighed by the risk of harm posed to consumers and the public. Accordingly, GM's concealment and omission of the transmission defect constitutes an unfair business practice in violation of the UCL.

216. GM's omissions as to the safety defect at issue caused Plaintiffs and the Class members to make their purchases or leases of their Class Vehicles. Had GM disclosed the defect, Plaintiffs and the Class members would not have purchased or leased the Class Vehicles, would not have paid the price they paid to purchase and/or to lease the Class Vehicles, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective transmissions.

217. As a result, Plaintiffs and the other Class Members have suffered injury in fact, including lost money or property, as a result of GM's omissions.

218. The Class Vehicles have suffered a diminution in value as a result of the defective condition of the 10-speed transmissions.

219. Plaintiffs seek to enjoin further, unlawful, and/or fraudulent acts or practices by GM under Cal. Bus. & Prof. Code section 17200.

220. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; to restore to Plaintiffs any money it acquired by unfair competition, including restitution, as provided in Cal. Bus. & Prof. Code sections 17203 & 3345; and for such other relief set forth below.

**Count II:**
**Consumers Legal Remedies Act**

221. Paragraphs 1 through 208 are realleged.

222. Morales brings this claim on behalf of themselves and the Consumer Subclass.

223. Moralesand the members of the Consumer Subclass are "consumers" within the meaning of Cal. Civ. Code section 1761(d) because they are individuals that acquired or leased the Class Vehicles for personal, family, or household purposes.

224. California's Consumers Legal Remedies Act (Cal. Civ. Code section 1750, et seq.) ("CLRA") proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

225. The Class Vehicles are "goods" as defined by Cal. Civ. Code. section 1751(a).

226. Plaintiffs do not assert CLRA claims on behalf of business entities or persons who acquired the Class Vehicles primarily for commercial use.

227. GM made numerous representations concerning the benefits, safety, performance, and reliability of the Class Vehicles that were misleading.

228. Plaintiffs and the Class were deceived by GM's failure to disclose that the Class Vehicles' 10-speed transmission were defective.

229. GM's conduct was and remains in violation of the CLRA, including at least the following provisions:

a. Cal. Civ. Code section 1770(a)(2): Misrepresenting the approval or certification of goods;

b. Cal. Civ. Code section 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

c. Cal. Civ. Code section 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

d. Cal. Civ. Code section 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

e. Cal. Civ. Code section 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

230. Despite having numerous opportunities to disclose the Transmission Defect, GM omitted and concealed it from Plaintiffs and the Class through every channel of information by which Defendant markets and sells the Class Vehicles. These channels include Defendant's website; advertisements across online, television, and print media; pamphlets and brochures; and GM's authorized dealerships, which are trained by GM and required to convey GM-mandated information regarding its vehicles to prospective purchasers. GM utilized none of these channels to disclose the Transmission Defect, notwithstanding ample opportunity to do so.

231. Plaintiffs and the Class have suffered injury in fact and actual damages resulting from GM's material omissions because they paid an inflated purchase or lease price for the Class Vehicles.

232. The Class Vehicles have suffered a diminution in value as a result of the defective condition of the 10-speed transmissions.

233. GM knew, should have known, or was reckless in not knowing of the 10-speed transmission's defective condition and that the defective condition rendered the Class Vehicles unsuitable for their intended use.

234. The facts GM concealed and omitted are material such that a reasonable consumer would have considered them to be important when deciding whether to purchase or lease the

Class Vehicles, and the price they were willing to pay to do so. Plaintiffs and the Class would not have purchased or leased the Class Vehicles or would not have paid the prices they paid to do so had GM not concealed and omitted the true facts concerning the 10-speed transmissions.

235. Plaintiffs seek injunctive and equitable relief for GM's violations of the CRLA. Such injunctive and equitable relief that Plaintiffs seek includes an injunction to enjoin GM from continuing its deceptive advertising and sales practices.

236. Plaintiffs have provided GM with notice of its violations of the CRLA pursuant to Cal Civ. Code section 1782(a). The notice was transmitted to GM on March 23, 2026.

237. Plaintiffs' and the Class's injuries were proximately caused by GM's fraudulent and deceptive business practices.

238. Plaintiffs are entitled to actual damages, in an amount to be proven at trial, restitution, reasonable attorneys' fees and costs, declaratory relief, and punitive damages, and all other relief available under the CRLA.

239. Plaintiffs are entitled to equitable relief under the CRLA.

**Count III:**
**California's False Advertising Law**

240. Paragraphs 1 through 208 are realleged.

241. Plaintiffs bring this claim on behalf of themselves and the Class.

242. California Business and Professions Code section 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

243. GM caused to be made and/or disseminated through California and the United States–through advertising, marketing and other publications–statements that were untrue or misleading and which were known, or which by the exercise of reasonable care should have been known, to GM to be untrue and misleading to consumers and Plaintiffs.

244. GM violated section 17500 because the omissions regarding the safety and reliability of its vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

245. GM's conduct also and separately violated the FAL because GM sold and leased the Class Vehicles at an inflated price while omitting material facts concerning the Transmission Defect; marketed the Class Vehicles in standardized materials as safe, reliable, durable, and fit for ordinary driving use while omitting the defect; and continued to conceal information relevant to defect, knowledge, and repair feasibility. Under these independent theories in this paragraph, Plaintiffs cite GM's post-sale service conduct, technical materials, and recall-related conduct as evidence of defect, knowledge, materiality, causation, and concealment, not as independent private causes of action.

246. Despite having numerous opportunities to disclose the Transmission Defect, GM omitted and concealed it from Plaintiffs and the Class through every channel of information by which Defendant markets and sells the Class Vehicles. These channels include Defendant's website; advertisements across online, television, and print media; pamphlets and brochures; and GM's authorized dealerships, which are trained by GM and required to convey GM-mandated information regarding its vehicles to prospective purchasers. GM utilized none of these channels to disclose the Transmission Defect, notwithstanding ample opportunity to do so.

247. Plaintiffs and the Class suffered an injury in fact and lost money or property as a direct and proximate result of GM's unfair, unlawful, and deceptive acts and omissions. GM's failure to disclose the defective nature of the 10-speed transmissions in the Class Vehicles was material, misleading, and likely to deceive reasonable consumers because the transmissions are dangerously prone to failure, including while the vehicles are being operated on public roadways,

thereby creating an unreasonable risk of crash. Had Plaintiffs and the Class known of the Transmission Defect, they would not have purchased or leased the Class Vehicles, or, at a minimum, would have paid substantially less for them.

248. As a result, Plaintiffs and the Class overpaid for the Class Vehicles and did not receive the benefit of their bargain.

249. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

250. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs any money GM acquired by unfair competition, including restitution, and for such other relief set forth below.

**Count IV:**
**Breach of Express Warranty**

251. Paragraphs 1 through 208 are realleged.

252. Plaintiffs bring this claim on behalf of themselves and the Class.

253. GM is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code section 2104.

254. GM provided express written warranties for the Class Vehicles in the course of marketing and selling the vehicles.

255. GM's written warranties promised that GM or its authorized dealers would diagnose, repair, or replace warranted defects and nonconformities that manifested during the applicable warranty periods and would perform such work without charge.

256. For example, GM's express written warranties for the Sierra Diesel Class Vehicles included a 3-year, 36,000-mile, bumper-to-bumper warranty and a 5 year, 100,000 mile powertrain warranty, as follows:

**New Vehicle Limited Warranty**

**Bumper-to-Bumper Coverage (Includes Tires)**

- Coverage for the first 3 years or 36,000 miles, whichever comes first.

**Powertrain Coverage**

- Coverage for the first 5 years or 60,000 miles, whichever comes first.
- 1500 Series Light Duty (LD) Pickups equipped with a 3.0L Duramax® Turbo-Diesel Engine and 2500 and 3500 Series Heavy Duty (HD) Pickups equipped with a 6.6L Duramax® Turbo-Diesel Engine are covered for 5 years or 100,000 miles whichever comes first.

257. Similarly, GM's express written warranties for the Yukon and Sierra Non-Diesel Class Vehicles included a 3-year, 36,000-mile, bumper-to-bumper warranty and a 5-year, 60,000-mile powertrain warranty, as follows:

**New Vehicle Limited Warranty**

**Bumper-to-Bumper (Includes Tires)**

- Coverage is for the first 3 years or 36,000 miles, whichever comes first.

**Powertrain**

- Coverage is provided for 5 years or 60,000 miles, whichever comes first

258. In addition or in the alternative to the allegations above, the Transmission Defect is caused in whole or in part by manufacturing and quality-control process deficiencies in the production of the 10L transmission's valve body assembly, including the production of valve

body plates and separator plates that were not manufactured to the flatness, surface-finish, and sealing tolerances required for proper transmission function.

259. These manufacturing and quality-control deficiencies include, without limitation:

a. Improper production of the gasketed sealing joint between the valve body plates and separator plates, such that the joint as produced does not maintain a reliable seal under the thermal, pressure, and vibration conditions experienced in normal transmission operation;

b. Insufficient flatness of the valve body plates and separator plates, such that the mating surfaces of the gasketed joint do not lie within the flatness tolerances necessary to maintain a consistent, leak-free seal across the full sealing surface;

c. Deficient surface texture and surface finish at the gasketed joint, such that the mating surfaces do not provide the surface characteristics necessary for the gasket to seat properly and maintain a reliable seal; and

d. Inadequate quality-control and testing feedback loops, such that the foregoing manufacturing deficiencies were not identified, investigated, or corrected through GM's production quality-control and testing processes, and instead were permitted to persist in vehicles delivered to consumers.

260. The cumulative effect of these manufacturing and quality-control deficiencies is that the valve body plates and separator plates produced for the 10L transmission do not provide an adequate sealing surface for the gasketed joint. As a result, ATF leaks from the gasketed joint into unintended areas within the valve body and elsewhere within the transmission. ATF leakage of this nature disrupts the hydraulic pressures on which the 10L transmission relies for proper shift control and valve operation, contributing to the harsh shifting, erratic shifting, gear hunting, shuddering, slipping, and—in the failure mode that GM has acknowledged in its Part 573 recall filings—the excessive control-valve wear culminating in momentary wheel lockup, that together constitute the Transmission Defect.

261. The Class Vehicles were therefore not manufactured in conformity with GM's design specifications, GM's own manufacturing and quality-control standards, or the standards of merchantability and fitness applicable to passenger-vehicle transmissions.

262. GM breached its express warranties to repair defects. GM has not repaired, and has been unable to repair, the Vehicles' defects.

263. GM's express warranties further promised heightened, superior, and state-of-the-art safety, reliability, efficiency, and performance, as detailed above. The warranties were made in GM's advertisements, marketing materials, and in uniform statements GM provided to and instructed its salespeople in for purposes of selling the Class Vehicles. These affirmations and promises were part of the basis of the bargain between the parties.

264. These additional warranties as to safety, reliability, efficiency, and performance were also breached because the Class Vehicles were not fully operational, safe, efficient, reliable, or capable of consistently performing as warranted. GM did not provide vehicles performing in conformance with these warranties at the time of sale and has not corrected this shortcoming since that time.

265. The limited warranty of repair also fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because GM has failed and/or refused to provide the promised remedies adequately and within a reasonable time. As such, Plaintiffs are not limited to the limited warranty of repair to parts defective in materials or workmanship, and Plaintiffs seek all remedies as allowed by law.

266. GM knew the Class Vehicles did not conform to the warranties and were inherently defective at the time it warrantied and sold the vehicles and wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Class Vehicles. Plaintiffs and the Class were therefore induced to purchase and/or to lease the Class Vehicles under false and/or fraudulent pretenses. Under these circumstances, any limitations whatsoever precluding the recovery of incidental and/or consequential damages are unenforceable under Cal. Civ. Code section 1670.5 and/or section 1668.

267. Moreover, many of the damages flowing from the Class Vehicles cannot be resolved through the limited remedy of repair, as those incidental and consequential damages have already been suffered due to GM's fraudulent conduct as alleged herein. And, due to GM's failure to provide such limited remedy within a reasonable time, placing any limitation on Plaintiffs' and the Class's remedies would render them insufficient to make Plaintiffs and the Class whole.

268. GM has neither repaired the Vehicles of Plaintiffs and Class members that brought their Vehicles in for repair nor addressed all those vehicles' transmission defects. Plaintiffs and the Class members that could have, but did not, bring their Vehicles in for repair should be excused because GM does not yet have a complete repair solution for the Transmission Defect.

269. As a direct and proximate result of GM's breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

270. The transmission-related nonconformities alleged herein manifested during the applicable warranty periods in the named Plaintiffs' vehicles and, on information and belief, in Class Vehicles sold or leased in California. GM has failed to conform the vehicles to warranty within a reasonable time after presentation for repair.

271. Plaintiffs do not base this Count on generalized advertising puffery or aspirational statements. Plaintiffs base this Count on GM's written repair warranties and failures to honor them.

272. Plaintiffs do not seek class-wide revocation, rescission, or incidental or consequential damages under this Count.

273. If necessary, Plaintiffs seek certification of separate warranty subclasses keyed to the written warranty forms applicable to the vehicles at issue.

**Count V:**
**<u>Implied Warranty</u>**

274. Paragraphs 1 through 208 are realleged.

275. Plaintiffs bring this claim on behalf of themselves and the Class.

276. GM is and was at all relevant times a merchant with respect to motor vehicles under Cal. Com. Code section 2104.

277. A warranty that the Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Cal. Com. Code section 2314.

278. The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Vehicles are inherently defective in that 10-speed transmission symptoms may occur suddenly and without warning in traffic, and the transmissions were not adequately designed, manufactured, and tested.

279. Plaintiffs and the Class have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract. Notwithstanding this, privity is not required in this case because Plaintiffs and the Class are intended third-party beneficiaries of contracts between GM and its dealers; specifically, they are the intended beneficiaries of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

280. As a direct and proximate result of GM's breach of the warranties of merchantability, Plaintiffs have been damaged in an amount to be proven at trial.

**Count VI:**
**<u>Magnuson-Moss Warranty Act</u>**

281. Paragraphs 1 through 208 are realleged.

282. Plaintiffs bring this claim on behalf of themselves and the Class.

283. This claim arises from GM's violations of the Magnuson-Moss Warranty Act (MMWA) through GM's failure to honor the warranties applicable to the Class Vehicles.

284. Plaintiffs are consumers as defined in 15 U.S.C. § 2301(3).

285. GM is a supplier and warrantor as defined in 15 U.S.C. § 2301(4)(5).

286. The Vehicles are consumer products as defined in 15 U.S.C. § 2301(6).

287. GM delivered the Vehicles subject to a written warranty and/or a service contract as those terms are defined in 15 U.S.C. §§ 2301(6) and 2301(8), respectively.

288. 15 U.S.C. § 2301(a)(1) requires GM, as warrantor, to remedy any defect, malfunction or nonconformance of the Vehicles within a reasonable time and without charge to Plaintiffs.

289. The amount in controversy of this action exceeds the sum of $75,000.00, exclusive of interest, costs and attorney fees, computed based on all claims to be determined in this lawsuit.

290. The 10-speed transmission defects occurred within the temporal scope and mileage parameters set forth in GM's written express warranty, yet GM failed to repair the Vehicle's Transmission Defects under the warranty adequately and within a reasonable time.

291. 15 U.S.C. § 2310(d)(1) permits Plaintiffs to bring an action against GM for any breach of express and implied warranty arising under state law and any violation of the MMWA.

292. 15 U.S.C. § 2308(a) prohibits GM from disclaiming the implied warranty of merchantability, and 15 U.S.C. § 2308(c) renders any attempted disclaimer invalid.

293. Plaintiffs have had direct dealings with either GM or GM's agents to establish privity of contract with GM.

294. GM authorized dealerships and technical support organizations operating under contract with GM are GM's agents.

295. Notwithstanding the foregoing allegations, privity is not required because Plaintiffs are intended third-party beneficiaries of contracts between GM and its dealers. The dealers were not intended to be the ultimate consumers of the Vehicles and have no rights under the warranty agreements provided with the Vehicles; the warranty agreements were designed for and intended to benefit the consumers (including Plaintiffs herein) only.

296. GM has failed and/or refused to remedy, within a reasonable time and without charge, the defective 10-speed transmissions.

297. GM has had a reasonable opportunity to cure its breach.

298. Giving GM additional opportunity to cure its breach of its written warranties would be unnecessary and futile here. GM has failed, after numerous attempts, to cure the defective 10-speed transmissions.

299. At the time of the sale or lease of each of the Vehicles, GM knew, should have known, or was reckless in not knowing, of its omissions and/or misrepresentations concerning the 10-speed transmissions' inability to perform as warranted, but GM nonetheless failed to rectify the situation and/or to disclose the defective condition. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure or give GM additional opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

300. As a result of GM's breaches of express and implied warranties, GM's failure to remedy the Transmission Defect within a reasonable time and without charge to Plaintiffs, and GM's other violations of the MMWA, as set forth supra, Plaintiffs have suffered the damages set forth herein.

301. Plaintiffs would suffer economic hardship if they returned their Vehicles but did not receive the return of all payments made by them. Because GM refuses to acknowledge any revocation of acceptance and to return, immediately, any payments made, Plaintiffs have not re-accepted their Vehicles by retaining them, as they must continue to use them due to the financial burden of securing alternative means of transport for an uncertain and substantial period of time.

302. For Vehicles covered by a lease or finance contract, GM has a duty to indemnify and to hold Plaintiffs harmless, should Plaintiffs prevail on their claims for violation of the MMWA. For GM's violation of the MMWA, Plaintiffs seek all damages permitted by law, including diminution in value of the Vehicles and/or loss of the benefit of the bargain, in an amount to be proven at trial. Plaintiffs seek an Order requiring GM to accept return of the

Vehicles and to refund Plaintiffs' purchase or lease price, together with taxes, insurance premiums, interest, costs and actual attorney fees as provided by 15 U.S.C. § 2310(d)(2), or in the alternative and at Plaintiffs election prior to entry of the Court's final judgement, that Plaintiffs be awarded damages in the amount Plaintiffs are found to be entitled, plus interest, costs and attorney fees.

**Count VII:**
**Unjust Enrichment**

303. Paragraphs 1 through 208 are realleged.

304. Plaintiffs bring this claim on behalf of themselves and the Class.

305. GM knew of the Transmission Defect in the Class Vehicles and failed to disclose same to Plaintiffs and the Class.

306. GM was able to charge a higher price for the Class Vehicles through its fraudulent acts and omissions in concealing the true, defective condition of the 10-speed transmissions. As a result, GM obtained monies which rightfully belong to Plaintiffs by charging a higher price for the Class Vehicles which greatly exceeded their true value.

307. GM appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and the Class, who were without knowledge of the 10-speed transmissions' defective condition and as such paid a higher price for the Class Vehicles, which actually had much lower values. As such, it would be inequitable for GM to retain these wrongfully obtained profits.

308. Plaintiffs, therefore, are entitled to restitution and seek an order that establishes GM as constructive trustee of the profits unjustly obtained, plus interest.

## VII. Request for Relief

309. Plaintiffs respectfully demand a jury trial on all claims so triable and request that the Court enter judgment in their favor and against GM as follows:

a. Certifying the proposed Class and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

b. Awarding actual, compensatory, statutory, incidental, consequential, and punitive damages and restitution as permitted by law;

c. Awarding appropriate injunctive and declaratory relief, including relief that requires GM to cease deceptive practices and to provide appropriate disclosure and remediation concerning the Transmission Defect;

d. Awarding restitution, disgorgement, and all other equitable relief permitted by law;

e. Awarding, where legally available and elected by the appropriate Plaintiffs, repurchase, replacement, rescission, or other vehicle-specific relief;

f. Awarding pre-judgment and post-judgment interest;

g. Awarding reasonable attorneys' fees and costs as permitted by law; and

h. Awarding such other and further relief as the Court deems just and proper.

Dated: June 26, 2026

Respectfully Submitted,

By: */s/William Ourand*________

Micheal F. Ram, SBN 104805
mram@forthepeople.com
Colin Losey, SBN 352223
colin.losey@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
1390 Market Street, Suite 200
San Francisco, CA 94102
Telephone: (415) 846-3862
Facsimile: (415) 358-6293

William Ourand (pro hac vice)
**MORGAN & MORGAN**
158 N Harbor City Blvd,
Melbourne, FL 32935
Telephone: (321) 241-0255
Facsimile: (321) 361-3554

*Attorneys for Plaintiffs*